[No. H027487. Sixth Dist. July 18, 2005.]

THERESA DALY, Plaintiff and Appellant, v.
PETER YESSNE et al., Defendants and Respondents.

---

## COUNSEL

Dudugjian & Maxey, Robert P. Dudugjian and Edward A. Smith for Plaintiff and Appellant.

Heller Ehrman, Martin H. Myers and David M. Chaiken for Defendants and Respondents Peter Yessne, Gail C. Bates Yessne and Jack Cook.

Thoits, Love, Hershberger & McLean, E. David Marks and Kenneth R. Van Vleck for Defendant and Respondent Staffing Industry Analysts, Inc.

**OPINION**

**ELIA, J.**—In this appeal plaintiff Theresa Daly challenges a summary judgment entered in favor of her former employer, Staffing Industry Analysts, Inc. (SIA), and three directors on its board. Plaintiff contends that triable issues of fact existed on her derivative and individual claims, in which she asserted breach of contract, breach of fiduciary duty, dilution of her minority interest, and diversion of corporate assets. We find no error and affirm the judgment.

### Background

SIA provides business intelligence, market data, news, and analysis to industries that use contingent or temporary staff. Defendant Peter Yessne, SIA's founder and president, served in various executive capacities, including officer and director, from the inception of the company in 1990 through the present litigation. Peter Yessne's wife, defendant Gail Bates Yessne, also served as a director of the company and, at various times, as its secretary. Plaintiff served on the board of directors from February 26, 1995 through March 30, 1996.

When it was incorporated in 1990, SIA issued 25,000 shares of stock to the Yessnes. On two subsequent occasions in 1992 and 1994, the Yessnes received additional shares in consideration of loans made to the company. The board of directors also authorized stock option grants to Peter Yessne on two occasions and to two other employees, including plaintiff.

Plaintiff began working for SIA as a temporary employee in December 1990. In April 1991 she was offered the position of associate editor, along with an incentive stock option plan that allowed her to purchase up to 10,000 shares of SIA stock at $2.58 per share. Plaintiff signed the accompanying "Incentive Stock Option Agreement" and "Stock Repurchase Agreement." The former specifically provided for a vesting of 2,000 shares after each year of employment, vesting fully after five years. Any unexercised and unvested options would expire within 10 years (April 2001) or within 30 days after she left the company. Upon termination of employment, the Stock Repurchase Agreement required her to sell (and the company to buy) all the shares she then owned. The purchase price for these shares was to be determined by the "fair market value for a share of common stock as last determined by the corporations [*sic*] Board of Directors prior to the termination date."

Plaintiff's stock options fully vested in April 1996. She did not purchase any shares, however, until December 28, 1999, when she acquired all 10,000.

Plaintiff resigned from the company effective August 31, 2001. On August 29, 2001, the board of directors met to determine the fair market value

of SIA's stock in order to comply with its obligation under the Stock Repurchase Agreement. Using "the same general method" as he had "in the past," Peter Yessne determined the fair market value to be $23.51 per share. Accordingly, on September 20, 2001, SIA offered to pay plaintiff $235,100 for her 10,000 shares. Plaintiff, however, rejected the offer and retained the shares. On December 3, 2001, she filed suit against SIA.

Plaintiff's third amended complaint asserted both individual and derivative claims for breach of contract, breach of fiduciary duty, negligent misrepresentation, and various forms of fraud. She requested declaratory relief, damages, and an accounting. The four claims for fraud and misrepresentation were dismissed with prejudice after defendants' demurrer was sustained without further amendment by plaintiff.

In their demurrer to the contract cause of action defendants had asserted that plaintiff had not alleged a failure to purchase her shares in accordance with the contract terms, which defined the fair market value of her stock as the amount determined by the board of directors before her termination date. Plaintiff resisted this ground for demurrer by arguing that this claim encompassed an allegation that defendants had breached an implied promise to determine the value of her stock fairly and in good faith. The court interpreted plaintiff's argument as an assertion of breach of covenant of good faith and fair dealing and overruled the demurrer on this ground.

Another source of controversy reflected in plaintiff's lawsuit was a $500,000 loan from SIA to the Yessnes in February 1998. Plaintiff alleged that the Yessnes had used the money to buy a building for their own benefit and then avoided repaying the loan. She also asserted unauthorized issuances of stock to the Yessnes that diluted her own interest; the rejection of offers to purchase SIA, thereby avoiding payment to her of the value of her shares; and excessive payments to the Yessnes of stock options, salary, bonuses, and other "gratuities." These acts, according to plaintiff, diluted and devalued the stock and constituted "a waste and diversion of the corporate assets" to the detriment of SIA and its shareholders.

On December 5, 2003, defendants moved for summary judgment or, alternatively, summary adjudication of the remaining causes of action. Defendants argued, inter alia, that (1) plaintiff had no standing to bring derivative claims, (2) they owed her no fiduciary duty, (3) the business judgment rule protected defendants' decisions, and (4) plaintiff could not establish a factual basis for breach of contract or breach of the covenant of good faith and fair dealing.

On March 26, 2004, after a thorough review of the parties' moving and responsive papers, the trial court granted the motion. The court found that the first cause of action, which alleged a derivative claim against the individual directors, could not be sustained because most of the challenged transactions had taken place before plaintiff acquired title to her shares, and she could not be said to be a beneficial shareholder. The one transaction that did occur after she became a shareholder—the directors' failure to accept a third party offer to buy the company—was subject to the business judgment rule.

As to the second cause of action for breach of contract, the court examined the promise set forth in the Stock Repurchase Agreement and determined that it unambiguously allowed the board to determine the repurchase price without resort to any particular formula for ascertaining fair market value. Plaintiff also had failed to present evidence that the board had acted in bad faith in selecting a valuation method or that its formula was unfair or objectively unreasonable. Consequently, the court ruled that plaintiff had failed to state a claim for breach of the covenant of good faith and fair dealing, which it found to be the more appropriate label for plaintiff's second cause of action.

Plaintiff's fourth cause of action for declaratory relief alleged a dispute regarding the percentage of ownership plaintiff was entitled to hold. According to the complaint, defendants attributed 19.6 percent of the stock ownership to plaintiff, whereas she should own 36.4 percent. The court rejected plaintiff's position because the undisputed facts showed that plaintiff held 10,000 of the 51,000 outstanding shares.[1] Moreover, plaintiff had conceded that "the issue of percentage ownership ha[d] not yet resulted in any damages because SIA ha[d] not been sold." Because that event had not yet occurred, there was no actual controversy to be resolved by declaratory relief.

Finally, the court addressed the fifth cause of action for breach of the directors' fiduciary duty toward her as an individual. Plaintiff had argued that the harm she had suffered was unique to her because the defendant directors had used their power and control as majority shareholders to undervalue the stock so as to benefit themselves and harm her as minority shareholder. The trial court stated that plaintiff had failed to provide any evidence to support this position.

Finally, the court rejected the sixth cause of action for an accounting because this claim was based on the first cause of action, which the court had already summarily adjudicated. On April 15, 2004, having disposed of all substantive claims, the court entered judgment for defendants.

---

[1] The Yessnes held the remaining 41,000.

*Discussion*

1. *Standard and Scope of Review*

■ Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant who moves for summary judgment or summary adjudication bears the initial burden to show that the action or cause of action has no merit—that is, "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subds. (a), (p)(2).) A defendant can meet that burden by presenting affirmative evidence that negates an essential element of plaintiff's claim or by submitting evidence "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" supporting an essential element of its claim. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855 [107 Cal.Rptr.2d 841, 24 P.3d 493]; see *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

■ Once the defendant has met that burden, the burden shifts to the plaintiff "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists, but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).)

■ On appeal, we conduct a de novo review of the record to "determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 334.) We apply "the same three-step analysis as that of the trial court: (1) identification of issues framed by the pleadings; (2) determination of whether the moving party has established facts [that] negate the opponent's claim and justify a judgment in movant's favor; and (3) determination of whether the opponent demonstrates the existence of a triable, material factual issue." (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 887 [41 Cal.Rptr.2d 740]; see also *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 84–85 [20 Cal.Rptr.3d 1].) "We need not defer to the trial court and are not bound by the reasons for the summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Knapp v. Doherty, supra,* 123 Cal.App.4th at p. 85.)

## 2. Breach of Contract

In the second cause of action for breach of contract plaintiff pleaded the following facts. Before she exercised her option to buy the 10,000 shares of SIA, the Yessnes told her that "when the time came for her shares to be bought back by the company . . . she would receive the actual fair market value for her shares." Thus, when she bought the stock she reasonably believed that when she sold it back to the company, its fair market value would be determined by the board "objectively and fairly and would reflect its actual value." She would not have purchased the shares if she had known that the valuation was going to be based on "some arbitrary method not consistent with a determination of actual fair market value." Plaintiff thus alleged that defendants had breached the Stock Repurchase Agreement, including the covenant of good faith and fair dealing, by failing to repurchase her shares at their "actual" fair market value.

Defendants met their initial burden by showing that plaintiff was unable to establish any obligation to calculate fair market value by any particular formula other than what was set forth in the Stock Repurchase Agreement. It was undisputed that the valuation formula used in August 2001 consisted of the "fair market value for a share of common stock as last determined by the corporations [sic] Board of Directors prior to the termination date."

Plaintiff admitted in discovery that she understood this provision and that she had had no concerns about the formula or its lack of specificity when she signed the agreement. She did not allege in her complaint that the board had set the price for her stock by a different method than had been provided for in the agreement. The trial court correctly determined that the Stock Repurchase Agreement was "unambiguous on its face" and "did not mandate that the Board use any particular formula to calculate the fair market value."

Because plaintiff could not show a violation of the terms of the Stock Repurchase Agreement, the trial court considered an alternative position— breach of the implied covenant of good faith and fair dealing, which had been indirectly asserted in the complaint and which plaintiff had previously argued in her opposition to the demurrer. The court concluded that there was no evidence or legal authority tending to show that the board's valuation of the stock had been made in bad faith or was objectively unreasonable.

Plaintiff, however, now repudiates that approach, maintaining that she was in fact asserting only breach of contract, which did not require her to prove a "bad faith" or "objectively unreasonable" valuation method. As noted above,

however, the court did consider the allegation that SIA had breached the contract terms by failing to calculate "actual" fair market value. It correctly concluded that a breach would have entailed a failure to set a price for plaintiff's stock in accordance with the fair market value "as last determined by the . . . Board of Directors prior to the termination date." As it was undisputed that the board had complied with this provision, the question of which party's valuation method better reflects the actual fair market value is not a material issue requiring trial. The court correctly granted summary adjudication of the breach of contract claim.

### 3. *Derivative Claim*

#### a. *"Contemporaneous Ownership" Rule*

Plaintiff's first cause of action alleged "on behalf of SIA" that the directors had diluted her interest in the company and had wasted and diverted corporate assets by (1) carrying out unauthorized stock transactions for their own benefit; (2) allowing themselves to receive excessive bonuses, salary, stock options, and other payments; (3) declining offers by third parties to purchase SIA, thereby avoiding payment for plaintiff's shares; and (4) loaning $500,000 to the Yessnes for the purchase of a building, thereby diverting money that could have been used to benefit the company.

Defendants assert that plaintiff lacks standing to bring a shareholder derivative action because it is undisputed that all but one of the listed acts took place before she acquired her shares on December 28, 1999. Plaintiff concedes this fact, but she maintains that from the time she signed the Stock Repurchase agreement in April 1991 she held a "vested beneficial interest" in the stock, an interest that increased each year until April 1996, when her option allowed her to buy 10,000 shares. The parties disagree over the application of the "contemporaneous ownership rule," the basis of the court's determination that plaintiff lacked standing to challenge these preownership transactions.

The "contemporaneous ownership" rule is reflected in Corporations Code section 800, subdivision (b)(1) (hereafter section 800(b)(1)), which requires (with specified exceptions not before us) that a plaintiff in a derivative action be "a shareholder, of record or beneficially" at the time of the challenged transaction. The parties' dispute focuses on the word "beneficially." Citing the fourth edition of Black's Law Dictionary (4th ed. 1968, p. 199) plaintiff contends that the statute should be construed liberally to include an "advantage resulting from a contract."[2] Plaintiff also relies on *Pearce v. Superior Court* (1983) 149 Cal.App.3d 1058 [197 Cal.Rptr. 238],

---

[2] The fifth edition of Black's Law Dictionary does not contain this language. It defines "beneficial interest" as a "right or expectancy in something (such as a trust or an estate), as

where the court construed section 800(b)(1)—and specifically, the term "beneficially"—to confer standing on a beneficiary of a trust, which was invested almost exclusively in the defendant corporation

■ We cannot extend the *Pearce* holding to the facts before us. The plaintiff in *Pearce* received substantial current income from the trust as well as being a contingent beneficiary of its corpus. She therefore had an actual and contemporaneous interest in the well-being of the corporation. Here, however, plaintiff had no current investment, direct or through a third party, in SIA when most of the challenged events occurred. Her interest before December 28, 1999, was only a contractual arrangement that permitted her to buy stock in the company; like a holder of a warrant or convertible debenture, she had not assumed the risks and benefits of stock ownership. (Cf. *Helvering v. Southwest Consol. Corp.* (1942) 315 U.S. 194, 200–201 [86 L.Ed. 789, 62 S.Ct. 546 [warrant holder, whose rights are "wholly contractual," is not a stockholder, either in law or in equity]; *Simons v. Cogan* (Del. 1988) 549 A.2d 300, 303 [convertible debenture confers no equity interest in issuing corporation until converted into stock].) Thus, although equitable ownership may confer standing upon a plaintiff to sue derivatively, "[t]he holder of an option to purchase stock is not an equitable stockholder of the corporation." (*Harff v. Kerkorian* (1974) 324 A.2d 215, 219, revd. in part on another ground in *Harff v. Kerkorian* (Del. 1974) 347 A.2d 133; *Gamble v. Penn Val. Crude Oil Corp.* (1954) 34 Del.Ch. 359 [104 A.2d 257, 260] [option holder was under no obligation to buy any shares from the corporation and was therefore not an equitable shareholder].)

■ Furthermore, plaintiff's assertion of standing is inconsistent with the contractual arrangement between the parties. The Incentive Stock Option Agreement, which plaintiff executed on April 1, 1991, the day of the employment offer, expressly provided that "Employee shall have no rights as a stockholder with respect to the option shares until payment of the option price and delivery to him/her of such shares . . . ." Even a broad reading of section 800(b)(1) does not expand plaintiff's rights beyond the express terms of the agreement she made with SIA. We must conclude, therefore, that plaintiff had no standing to bring a derivative claim for acts that took place before she converted her options into shares.[3]

---

opposed to legal title to that thing." (Black's Law Dict. (5th ed. 1979) p. 828.) The eighth edition retains that definition.

[3] In her reply brief plaintiff invokes an exception to the "contemporaneous ownership" rule for continuing wrongs. For reasons of fairness we will not consider this new theory. (See *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764–766 [60 Cal.Rptr.2d 770].)

### b. *Business Judgment Rule*

With respect to one of plaintiff's allegations in the derivative claim, the asserted wrong took place *after* she acquired her shares. Plaintiff alleged that the directors had "declined offers to sell SIA to a third party(ies) to avoid having to pay plaintiff the value of her 10,000 shares through the sale." Defendants interpreted this statement as a charge of harming the interests of the company by violating their duty to sell it to Anacapa Ventures, an entity with which plaintiff was associated. They continue to argue that there is no issue of fact regarding any conflict of interest, fraud, or bad faith by the directors, and they point out that plaintiff failed to plead the existence of a duty to carry out that transaction.

Defendants have misunderstood plaintiff's allegation, possibly because it was obliquely worded in her complaint. In any event, plaintiff explains that she was not alleging a wrongful act by not selling the company to Anacapa; the only significance of the proposed transaction was that the board was claiming between $3 million and $3,600,000 as the fair market value of SIA in late 2001, shortly after her departure from the company.[4] In light of this clarification, we agree with plaintiff that the facts surrounding the Anacapa negotiations and failed transaction are irrelevant to any application of the business judgment rule in this case.

Plaintiff does address the business judgment rule, however, in the context of SIA's $500,000 loan to the Yessnes, which enabled the Yessnes to buy a commercial building and move SIA there. The result, according to plaintiff, was a 600 percent increase in rent payable by SIA to the Yessnes. She argues that these facts, which defendants' analysis "conveniently ignores," establish "a conflict of interest and self dealings" that take the case outside the reach of the business judgment rule.

Neither defendants nor the trial court discussed the business judgment rule with respect to this allegation. However, such analysis was unnecessary, because the allegation was part of the derivative cause of action, which plaintiff lacked standing to pursue. The events of which she complains—the "self-interest, self dealing" loan, the ensuing lease of the building by the Yessnes to SIA, and the moving and remodeling expenses—all took place before plaintiff acquired her shares.[5] The applicability of the business judgment rule as a viable defense is therefore a moot question.

---

[4] The board's August 2001 valuation at $23.51 per share yields a total *stock* value of $1,199,010.

[5] According to Peter Yessne's declaration, the loan was approved by the board in February 1998 and was completely repaid by December 2001. According to plaintiff, the company moved its offices to the leased building in early 1999.

### 4. *Fiduciary Duty*

In the fifth cause of action of her complaint, plaintiff asserted a breach of fiduciary duty toward her as an individual minority shareholder. According to the complaint, the directors acted arbitrarily and in bad faith by undervaluing the company stock "at precisely the time SIA was to repurchase the [shares] from plaintiff." In a different part of the complaint, plaintiff also alleged that defendants knowingly diluted her interest in the company by issuing additional shares to majority shareholders (the Yessnes) outside the employee stock option plan, without giving her the same opportunity to increase her percentage interest. The parties and the court regarded the latter assertion as part of the cause of action for breach of fiduciary duty.

In their summary judgment motion defendants argued that plaintiff could not establish this cause of action because (1) the claim of undervaluation was "exclusively derivative in nature," as the valuation affected all of SIA's shares; (2) no fiduciary duty was owed to plaintiff in 1994 when the alleged dilution occurred because she had not yet exercised any options; and (3) there was no evidence of bad faith in the valuation of plaintiff's shares.

Plaintiff suggests that a fiduciary relationship would exist between her and the SIA board if we were to agree that she has standing to assert a derivative claim for the period predating her acquisition of the 10,000 shares. We have already rejected the premise of this argument by holding that she had no standing to assert derivative claims based on events occurring while she was still only an option holder. For the same reasons, we further conclude that the board owed her no fiduciary duty during this period, thus precluding her complaint regarding dilution. (Cf. *Pittelman v. Pearce* (1992) 6 Cal.App.4th 1436, 1443 [8 Cal.Rptr.2d 359] [debenture holder is owed no special fiduciary duty by either the corporation or its directors]; see also *Simons v. Cogan, supra,* 549 A.2d at p. 304 [same]; see also *Powers v. British Vita* (S.D.N.Y. 1997) 969 F.Supp. 4 [no fiduciary duty owed to holders of employee "sweat" options because they have only expectancy interest, not equitable ownership interest].)

■ As to the undervaluation of her shares, we need not address the parties' debate over whether breach of fiduciary duty may be asserted as an individual claim. Assuming that it can (see *Denevi v. LGCC* (2004) 121 Cal.App.4th 1211, 1223 [18 Cal.Rptr.3d 276] [investor not barred by successful derivative claim from action to recover individual losses]; *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106–107 [81 Cal.Rptr. 592, 460 P.2d 464] [cause of action for breach of fiduciary duty withstands demurrer where

injury is to plaintiff and other minority stockholders, not corporation]; but see *Schuster v. Gardner* (2005) 127 Cal.App.4th 305 [25 Cal.Rptr.3d 468] [decline in stock value from management improprieties gave rise to derivative action only]), we nonetheless conclude that defendants met their burden to show that plaintiff could not establish this cause of action. A breach of fiduciary duty involves "the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101 [3 Cal.Rptr.2d 236].) The summary judgment motion presented undisputed facts that the August 2001 valuation of the stock occurred in accordance with the terms of the Stock Repurchase Agreement. In his declaration Peter Yessne stated that the board had discussed and approved his proposed valuation method, in which he followed the same procedure as he had in past years.[6] Yessne explained that he had developed his valuation method after consulting with individuals experienced in the valuation of stocks of closely held corporations similar to SIA. He also had reviewed articles, manuals and other materials regarding valuation of similar companies; and he had attended paid seminars and other presentations given by experts on the valuation of newsletter companies. He thereafter used his method "consistently" to value SIA stock. Yessne also testified that his purpose in the August 2001 valuation was to be consistent and fair.

Defendants thus provided affirmative evidence that the board had offered plaintiff a price in conformance with its contractual duty, and that it had arrived at that price in a manner consistent with the goal of fairness. Plaintiff did not have any concerns about the valuation provision in the Stock Repurchase Agreement, nor did she object to Yessne's determination of value until she filed the lawsuit. The burden therefore shifted to plaintiff to present a triable issue as to whether Peter Yessne and/or the board had exercised good faith in valuing the company stock. Plaintiff was unable to meet this burden, however. While she asserts that there is conflicting evidence on the question of the good faith of the directors and majority shareholders, the evidence she points to raises a factual dispute only as to the actual value of the company, not the existence of defendants' good faith. Thus, plaintiff did not succeed in raising a triable issue of fact on the issue of breach of fiduciary duty. Summary judgment was properly granted.

---

[6] Subject to adjustments for particular situations, "this method generally involved multiplying SIA's net pre-tax ordinary income by three, combining the resulting number with the company's annual revenues, dividing the resulting number by two, and dividing the resulting number by the number of shares outstanding."

## *Disposition*

The judgment is affirmed.

Rushing, P. J., and Premo, J., concurred.