[No. H031066. Sixth Dist. Oct. 12, 2007.]

SAN JOSE CONSTRUCTION, INC., Plaintiff and Appellant, v.
S.B.C.C., INC., Defendant and Respondent.

## COUNSEL

McPharlin Sprinkles & Thomas, Linda Hendrix McPharlin, Anne C. Stromberg and Paul S. Avilla for Plaintiff and Appellant.

Sweeney, Mason, Wilson & Bosomworth, Christopher J. Olson, Bradley D. Bosomworth; and Russell J. Hanlon for Defendant and Respondent.

## OPINION

**ELIA, J.**—This appeal arises out of an action by plaintiff San Jose Construction, Inc. (SJC) against its former employee, Richard Foust, and Foust's new employer, S.B.C.C., Inc., doing business as South Bay Construction Company (South Bay). The trial court granted a motion by South Bay for summary judgment, finding no triable issues of fact in the causes of action for misappropriation of trade secrets, intentional interference with prospective economic advantage, unfair competition, and interference with contract. SJC challenges the trial court's ruling as to all but the last of these claims. We agree with SJC that issues of material fact exist and therefore must reverse the judgment in South Bay's favor.

*Background*

SJC and South Bay are local competitors in the business of commercial construction. Defendant Foust[1] was a project manager at SJC from September 1999 to March 30, 2004. He directed all phases of construction from the preliminary design to the closeout of a project; in most cases he was the "interface" between the owner and the company.

In early 2004 Foust was responsible for 18 SJC projects in various stages of preconstruction, as well as two projects under construction. Sometime in the middle of March, however, Foust conveyed his unhappiness about working at SJC to Richard Furtado, the president and CEO (chief executive officer) of South Bay. Furtado recognized Foust as having a "proven track record." Although he had not been looking for more project managers, he offered Foust a position as senior project manager at a salary higher than South Bay's normal range for project managers. Foust had represented that he had clients that would move to South Bay with him; Furtado assumed, however, that Foust would not be bringing any current SJC projects to South Bay. On March 26, 2004, Foust accepted Furtado's offer, and he began work on March 30.

During those last two weeks of March Foust concentrated on "[t]rying to work out" the "deal" for employment at South Bay. Foust believed that SJC clients would follow him to another employer, so he took information on pending projects to enable him to "move forward with those projects." Foust used an assistant, Jennifer Davidson, to come in after hours to help him copy documents relating to five prospective jobs on which SJC had bid. Foust gave Davidson a diskette onto which she downloaded the contents of folders (more than 200 documents) relating to those projects. The downloaded information was then uploaded onto the South Bay system and copies of documents were placed in project binders. Of these projects, three were "ready to go," and two had an anticipated start time in May. The documents Foust took to South Bay included project budgets and proposals made to the owners, correspondence between owner and architect, all subcontractor bids, cost estimates, requests for information by subcontractors or project managers, and responses to those requests from the owner or architect. Thus, by the end of March 2004 Foust had everything he needed to begin work right away on at least three projects for South Bay.

One of the projects that was pending at SJC pertained to a condominium development at Ringwood Court. The owner, Borelli Investment Company,

---

[1] Foust was not involved in the summary judgment proceedings and is therefore not before us on appeal. The record does not indicate how the case proceeded against Foust.

was headed by Ralph Borelli. On March 12, 2004, a Friday, Borelli learned that Foust was going to be terminated from SJC, and the new project manager for Ringwood Court would be someone Borelli did not know. Borelli had been very satisfied with Foust's work. When SJC refused Borelli's request to keep Foust on the job, Borelli "called around" to find information about Foust's replacement at SJC.

Sometime during that weekend or the following Monday, Borelli told Foust that SJC was going to terminate him. Borelli said that he would probably grant the Ringwood Court project to South Bay, which had been the only other "serious bidder." Borelli did not tell Foust that the project would follow him wherever he went, but he did indicate that he would be comfortable using South Bay if that company produced a satisfactory estimate. On Tuesday, March 16, 2004, Borelli sent an e-mail to SJC informing the company that he "had no alternative other than to pull the work from them."

John DiManto, the current president of SJC, related a slightly different version of events in his deposition. DiManto stated that he had not told Borelli that Foust was going to be terminated; Borelli "jumped to that conclusion." According to DiManto, Borelli appeared at SJC on March 12, 2004, and announced that he wanted Foust to head the Ringwood Court project. Borelli indicated that if Foust was not assigned to the job, he was "thinking strongly of taking the project along with Rick wherever he was going." By this time SJC had already heard from subcontractors that Foust was negotiating employment at South Bay and that he was trying to get commitments from project owners in order to make his deal with South Bay. DiManto regarded Borelli's request as unprofessional; he did not appreciate what seemed to be a "subtle white collar extortion" and told Borelli that he was not inclined to comply.

Borelli had recommended SJC and Foust to Joe Vieira, the director of finance and the controller for Operating Engineers Local Union No. 3 (Operating Engineers). The Operating Engineers project was the subject of some urgency, as Vieira was anxious to get started and avoid delays. As of March 30, however, Foust had all the information necessary to proceed with the Operating Engineers project as well as Ringwood Court, because he still had the copies he had brought from SJC. The project known as Ross Hillsdale, owned by Thomas Biagini, was also "ready to go." Airtech and the Vault Lounge (the Vault) were still in the bidding process. However, the Vault was "way behind schedule" at great financial cost to many people, and the owner-partners were "quite anxious to move very quickly."

On March 29, 2004, Foust took a "sick day" even though he was not sick, in order to meet with Furtado and "finish out the deal" for employment at

South Bay. Late that afternoon, he called a number of subcontractors to meet with him the next day, his first day on the job at South Bay. He had a list of names and telephone numbers for several hundred subcontractors which he had brought with him from SJC, along with South Bay's master subcontractor list. At the March 30 meeting Foust told the subcontractors who were present that the five projects were "coming with [him] to South Bay" and that he was interested in having them participate. All but two accepted. Some of these began work on the projects before they had contracts with South Bay. Eric Stark, one of the subcontractors offered work on the projects, testified that he was not even asked for a new bid, because "Rick Foust already had my numbers." Stark declined the offer, giving up a million dollars of work, because he "just didn't feel right doing the work for South Bay that [he'd] bid for San Jose [Construction]." The other declining subcontractor similarly decided to honor his company's longstanding relationship with SJC.

That same day, March 30, 2004, SJC sent Foust a letter by overnight delivery discharging him from his employment, "effective immediately." The reason for the termination, according to the letter, was that "[w]e have information that, among other things, you have been taking sick days from your employment with us, while working for another employer." On April 2, 2004, SJC filed this action, naming both Foust and South Bay as defendants.

In his deposition Foust stated that between April 1 and April 6 he returned all of the SJC documents he had copied. Once he was directed by Furtado to return the information, he called Jennifer Davidson to erase it from his computer. She recalled being directed to delete only one project from the desktop on his computer. Nothing was erased from the diskettes. Exhibits subsequently produced in discovery indicated that the proposals to the project owners in early April were in large part the same as those produced by SJC the previous month.

After considerable discovery litigation, which resulted in more than $17,000 in sanctions against South Bay, and an unsuccessful request by SJC for preliminary injunctive relief, South Bay moved for summary judgment, or in the alternative, summary adjudication. South Bay asserted that the undisputed facts compelled the conclusion that SJC's causes of action for misappropriation of trade secrets, intentional interference with prospective economic advantage, statutory and common law unfair competition, and interference with contract failed as a matter of law. The trial court agreed. It concluded that the information relating to the five construction projects was not a trade secret; that SJC, not South Bay, was responsible for disrupting its business relationships with the project owners; and that there were no contracts with which South Bay could have interfered. As both of the unfair competition claims were based entirely on the failed misappropriation and

interference allegations, those causes of action likewise failed. The court further determined that SJC had not raised any triable issues of material fact, and accordingly it granted summary judgment to South Bay and denied injunctive relief to SJC. From the ensuing judgment on January 3, 2007, SJC brought this timely appeal.

## Discussion

### 1. *Scope and Standard of Review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant who moves for summary judgment or summary adjudication bears the initial burden to show that the action or cause of action has no merit—that is, "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subds. (a), (p)(2).) When the burden of proof at trial will be on the plaintiff by a preponderance of the evidence, the moving defendant "must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence' " to support a necessary element of the cause of action. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30], quoting *Aguilar, supra,* 25 Cal.4th at p. 854; see *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

If the defendant fails to meet this initial burden, it is unnecessary to examine the plaintiff's opposing evidence; the motion must be denied. (*Quintilliani v. Mannerino* (1998) 62 Cal.App.4th 54, 59–60 [72 Cal.Rptr.2d 359].) However, if the defendant makes a prima facie showing that justifies a judgment in its favor, the burden then shifts to the plaintiff to make a prima facie showing that there exists a triable issue of material fact. (*Aguilar, supra,* 25 Cal.4th at p. 850.) "The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists, but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).)

On appeal, we conduct a de novo review of the record to "determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 334; see *Daly v. Yessne* (2005) 131 Cal.App.4th 52, 58 [31 Cal.Rptr.3d 420].) We apply the same procedure used by the trial court: We examine the pleadings to ascertain the elements of the plaintiff's claim; the moving papers to determine whether the defendant has established facts justifying judgment in its favor; and, if the defendant did meet this burden, plaintiff's opposition to decide whether he or she has demonstrated the existence of a triable issue of material fact. (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 84–85 [20 Cal.Rptr.3d 1]; *Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 887 [41 Cal.Rptr.2d 740].)

We recognize that summary judgment " 'is a drastic measure which should be used with caution so that it does not become a substitute for trial.' " (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 610 [7 Cal.Rptr.2d 859]; see *Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159 [49 Cal.Rptr.3d 153].) Consequently, "[i]n performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "We need not defer to the trial court and are not bound by the reasons for the summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Knapp v. Doherty, supra,* 123 Cal.App.4th 76, 85.)

## 2. Allegations of the Complaint

Because summary judgment review is defined by the issues raised in the pleadings, we first direct our attention to the material allegations of SJC's complaint as they pertain to South Bay. In the third cause of action SJC alleged that it possessed trade secrets in the form of "bidding, estimating and cost processes, project management systems, preferred vendors and subcontractors, and client information relating to specific construction projects, and those projects' design build parameters and costs." These trade secrets had economic value "in that, among other things, (1) San Jose Construction has invested substantial time and money in developing its customer relations and information pertaining to its customers, and (2) San Jose Construction's trade secrets enable it to develop further business and provide services more effectively and economically than its competitors." SJC made reasonable

efforts to keep its trade secrets confidential, by, for example, requiring employees to sign confidentiality agreements and by allowing only "authorized employees" (such as project managers) access to its customer and financial information. South Bay, together with Foust, misappropriated these trade secrets by "copying and removing such information from [SJC's] computer system, by providing such information to South Bay Construction and by using such information to solicit customers of San Jose Construction, on behalf of South Bay Construction."

In the fourth cause of action for intentional interference with prospective economic advantage, SJC alleged that it had established business relationships containing "probable future economic benefits" to SJC. More specifically, with respect to the identified projects,[2] South Bay knew that Foust was unlawfully soliciting SJC's customer projects for South Bay's benefit by using SJC's confidential information and by using means prohibited by the Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.) and his confidentiality agreement.

The fifth cause of action for common law unfair competition contained the allegation that defendants had engaged in the prohibited conduct described in the foregoing paragraphs (i.e., misappropriating trade secrets, disrupting economic relationships, and breach by Foust of his confidentiality agreement) with the purpose of injuring SJC and obtaining a competitive advantage in soliciting SJC's existing customers. As a result, SJC was damaged by being "deprived of the patronage of clients."

In the sixth cause of action, SJC asserted a violation of the unfair competition law set forth in Business and Professions Code section 17200 et seq. SJC alleged that defendants had engaged in unfair, unlawful, and fraudulent business practices by obtaining and using SJC's confidential information and soliciting its customers.

Finally, the seventh cause of action was a claim for tortious interference with contract based on "existing contracts with customers to perform design build services on specific projects." South Bay was liable because it had approved or assisted Foust in his intentional interference with those contracts. SJC does not challenge the trial court's summary adjudication of this cause of action.

---

[2] The complaint listed several projects as the subject of the lawsuit. SJC eventually limited its claims to the five described earlier: Ringwood Court, Airtech, the Vault, Operating Engineers, and Ross Hillsdale.

### 3. South Bay's Showing

In its motion for summary judgment South Bay characterized SJC as a "jilted former employer" who was attempting to retaliate for Foust's move to a competitor. We address South Bay's showing separately for each cause of action.

#### a. Misappropriation of Trade Secrets

California's version of the UTSA defines "trade secret" as "information, including a . . . compilation . . . that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)[3] Whether information is a trade secret is ordinarily a question of fact. (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 300 [116 Cal.Rptr.2d 833]; *Thompson v. Impaxx, Inc.* (2003) 113 Cal.App.4th 1425, 1430 [7 Cal.Rptr.3d 427]; *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1521 [66 Cal.Rptr.2d 731].)

In moving for summary judgment South Bay argued that the information in the project documents and diskettes was not a trade secret within the meaning of section 3426.1, subdivision (d), as it was not kept secret and it derived no independent economic value to SJC. South Bay represented that the materials consisted of "subcontractor proposals, correspondence to and from subcontractors, correspondence to and from project owners and various proposals and draft budgets to owners." The diskettes were, according to South Bay, "miscellaneous forms (change order logs, RFI logs, meeting minutes, etc.) that Rick Foust had created at [SJC]."

In its response, SJC emphasized that the compilation encompassed "much more than customer lists." According to SJC, the binders included "the project budgets and proposals to the owner, correspondence between the owner and architect, all the bids received from subcontractors (along with descriptions of the exclusions and inclusions reflected in the bid numbers), additional estimating documents, [and] Requests for Information ('RFI's') generated by subcontractors or Foust, with responses from the owner or architect, and special reports unique to the project."

Neither party submitted adequate references to evidence supporting their arguments and statements of undisputed fact. Nevertheless, the parties do not

---

[3] All further statutory references are to the Civil Code unless otherwise specified.

question each other's description of the materials Foust took. The more critical question is whether the information in these documents derived independent economic value from not being generally known by SJC's competitors and whether SJC made reasonable efforts to maintain its secrecy.

South Bay argued, and maintains on appeal, that the binder documents could not have contained trade secrets because all had been either generated by or disclosed to third parties, whether project owners, architects, or subcontractors. The trial court agreed with South Bay that because those third parties had the same information, they were free to share it with defendants, and it therefore could not be considered a trade secret. South Bay also argues that it "easily could have duplicated the [SJC] materials within days because both general contractors used the same subcontractors." South Bay points out that it requested and obtained new quotations from the subcontractors and submitted its own new bids to the owners. Furthermore, Foust returned the subcontractor list to SJC. In any event, he did not even need the subcontractor list because he used the same ones on every job. South Bay relies on *Moss, Adams & Co. v. Shilling* (1986) 179 Cal.App.3d 124, 128 [224 Cal.Rptr. 456] where the appellate court held that the names of a company's clients for whom a former employee had personally provided services were not trade secrets, and the employee therefore could use the company's Rolodex to inform those clients that the employee was changing employment.

South Bay misses the forest for the trees. It is not just the contact information for subcontractors or their prices that defendants were alleged to have wrongfully acquired, and Foust was not merely announcing his change of employment to South Bay. What SJC sought to protect was the overall compilation of the correspondence involving architects, SJC, and project owners; descriptions of the proposed scope of each project, measurements for each project building, and detailed cost estimates. SJC's budget proposals were based on a thorough review of construction drawings, site conditions, and other submissions by architects, structural engineers, and other engineering specialists. Ringwood Court alone involved multiple revisions over several months. SJC's then president, Patrick DiManto, explained in his declaration that in a design/build project "[t]he design and bid process itself can take between six months and a year (or longer, depending on the project). By the time the bid is finalized, SJC has typically invested tens of thousands of dollars in overhead and staff time (in addition to outside design/consultant fees) in developing a bid, selecting subcontractors and preparing to undertake construction." Clearly the process of generating a viable proposal is far more elaborate than contacting names on a subcontractor list and soliciting their bids.

The contractor who can satisfactorily and expeditiously complete this time-consuming process has a distinct advantage over competitors. Both

Borelli, representing ownership of Ringwood Court, and Foust stated that the starting date was urgent and that South Bay could have the job if Borelli was "satisfied with the numbers." He let Foust know that he "expected this to be a quick and easy transition" from SJC to South Bay. Operating Engineers also was a "time[-]sensitive project," with Joe Vieira expressing urgency about getting started. Likewise, the Vault had already been delayed a year, and the owners were "quite anxious to move very quickly."

This evidence indicates that those proposals that had been accepted by project owners and were ready to be implemented were a valuable asset of SJC. Moreover, the readiness of each project to be started depended not only on a list of subcontractor bids, but also on the determination, based on the information provided from all sources, that it could be completed at a profit. Foust admitted that this determination was dependent not only on his experience in the industry but also on the time he had spent on these projects during his employment at SJC. We can readily infer, therefore, that the information contained in SJC's project binders, viewed as a whole, derived economic value from being kept secret from competitors such as South Bay. As SJC describes it, "only SJC had the completed puzzle for each project, contained in the Project Binders. . . . No third party had it. The subcontractors each had a piece, and the owners had a piece, but no one except SJC had it all."

■ South Bay attempts to distinguish *Morlife v. Perry, supra*, 56 Cal.App.4th 1514 and *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006 [24 Cal.Rptr.3d 720]. In *Morlife,* a company that provided a specialized commercial roofing service had compiled a list of customers and their particular needs over a period of years. Two employees with intimate knowledge of these customers created a new company with a third person and solicited Morlife's customers. They used contact information contained on customer business cards representing 75 to 80 percent of Morlife's customer base, and many customers switched their business to the new company. (*Morlife, supra,* at p. 1518.) In affirming the judgment for Morlife after a court trial, the appellate court found substantial evidence to support the factual conclusion that the customer list was a trade secret within the meaning of the UTSA. The appellate panel acknowledged that "courts are reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories. [Citation.] On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers. [Citations.] As a general principle, the more difficult information is to obtain, and the more time and resources expended by an

employer in gathering it, the more likely a court will find such information constitutes a trade secret." (*Morlife*, at pp. 1521–1522.)

The *Morlife* court rejected the defendants' argument that the identity of the customers was the type of information generally known in the industry. We likewise reject South Bay's contention that the information taken from SJC was not a trade secret because it consisted of only a list of subcontractors whose identities were known in the construction industry. As we observed earlier, the information alleged to be a trade secret comprised much more than a list of subcontractors' names. Whether that information actually constituted a trade secret is a factual issue for the jury or court to determine at trial, as did the trial court in *Morlife*.

*ReadyLink Healthcare v. Cotton, supra*, 126 Cal.App.4th 1006 also involved a compilation of proprietary and confidential information—in that case, an employment recruiter's database containing employees, nurses, and customer health care providers, along with contact and compensation information, employment preferences, nurse applications and test records, and its unique per diem payment system. (*Id.* at p. 1018.) ReadyLink terminated the defendant for stealing these records and later sued him for misappropriation of trade secrets and other torts. The reviewing court upheld the lower court's grant of injunctive relief, noting that the defendant had admitted misappropriating proprietary and confidential information which he would need in order to engage in his own nurse staffing business. The court emphasized that its holding was limited in the procedural circumstances and noted that the question of whether the information was actually a trade secret was not a final adjudication on the merits and was " 'subject to proof presented at trial.' " (*Id.* at p. 1017, quoting *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1453 [125 Cal.Rptr.2d 277].)

South Bay maintains that notwithstanding the utility of the information to enable Foust to start the projects without delay, the binder contents provided no competitive advantage, because SJC would not have been retained anyway once Foust was no longer employed there. According to South Bay, the project owners "fired" SJC because they were "upset" with SJC for discharging Foust. South Bay produced letters and e-mail to SJC from owners who had decided to move their projects to South Bay in order to keep Foust as project manager.

SJC's responsive evidence, however, created a dispute as to whether the owners would have given the jobs to South Bay if there had been significant delays in obtaining bids and generating construction proposals. Borelli, for example, while favoring Foust, was willing to follow Foust to another company only if he "felt comfortable" with that company as a general

contractor. He told Foust that he would use South Bay for Ringwood Court only if the transition was a "quick and easy one" and the "numbers" were at least as good as SJC's numbers. And Thomas Biagini, owner of the Ross Hillsdale property, testified that he "probably" would not have used South Bay for Ross Hillsdale if he had known that Foust had taken documents and computer files from SJC. He took seven to 10 days to think about transferring to South Bay: "I needed time to really think about this before I made a move."

The complicated and time-intensive nature of the proposal process also weakens South Bay's argument that the subcontractor bids and "explanatory information" were not trade secrets because they could "easily" have been duplicated "within days," since both parties used the same subcontractors. Not only is this point limited to subcontractor bids, it is based on Furtado's opinion rather than actual events. Furtado testified that he directed Foust to return the binder documents because South Bay did not need them; it could "easily get the information in a 24-hour to 48-hour period." South Bay itself, however, states that it took Foust 30 to 35 days just to request new bids from subcontractors. SJC also offered evidence that some subcontractors did not provide new bids before they agreed to work on the same project for South Bay. Thus, it was not merely a simple matter of what South Bay called "reverse engineer[ing]" by instantly obtaining new bids from subcontractors. South Bay fails to establish as a matter of law that the entire proposal for each project could have been completed in time to satisfy the demands of all project owners.

Furthermore, SJC presented evidence showing a dispute as to whether Foust actually did "start from scratch," as he claimed. Foust's assistant thought that Foust had directed her to delete only one folder from his computer desktop. Foust submitted proposals to all of the project owners in early April, before receiving all of the subcontractor bids.

The South Bay proposals strongly resembled those offered by SJC in March 2004, and they were based on drawings done even earlier than that. During discovery South Bay produced a revised construction proposal for Ringwood Court *from SJC*, dated March 2, 2004, along with accompanying documents based on even earlier drawings and estimates. That proposal was very similar to a proposal from South Bay on April 12, 2004, even after one South Bay revision. The preliminary Airtech proposal from South Bay, submitted April 5, 2004, was identical to the one provided by SJC; it was based on March 2004 drawings, plans, and subcontractor bids, which were completed well before Foust was hired at South Bay. SJC and South Bay proposals for the Vault were also identical. The cost breakdowns in the detailed SJC proposals Foust had created for Ross Hillsdale resembled those

submitted later by Foust on behalf of South Bay, and no time was lost in moving the project from SJC to South Bay. The Operating Engineers proposals were also similar. In addition, South Bay appeared to have a copy of a February 2004 proposal to Borelli from SJC regarding the Operating Engineers project. Borelli and Biagini both testified that they had not given Foust any documents in their files relating to SJC's project proposals to help Foust transfer the projects to South Bay. Neither had copies of the successful subcontractor bids.

Foust admitted that the projects "would have started before the reverse engineering was a hundred percent completed." Some of the subcontractors began work before they were given contracts with South Bay; and it was "entirely possible," according to Foust, that he gave them "verbal [*sic*] agreements" before he received their bids. The asserted "reverse engineering" was completed between April and June of 2004; by June, construction was underway on all of the projects. The Operating Engineers project began in early April, based on South Bay's (i.e., Foust's) proposal but before a contract was signed, because one of the subcontractors had already started working.

South Bay argues that even if reverse engineering (an inapt term for Foust's explanation of having generated the proposals "from scratch") did not actually occur, the binder contents were not trade secrets because they *could* have been reverse engineered—that is, they were readily ascertainable. But here, as we have observed, that the binders contained individual components generated by or disclosed to third parties does not mean that the project proposal as a whole was available to each individual contributor. South Bay obliquely suggests that this case involves a "compilation of documents that the employer admittedly sent to or received from third parties." There is no evidence, however, that the entire contents of any one project binder were disclosed to a third party. Considering the length of time that each proposal took to create and finalize and the urgency with which four of the project owners impressed upon the prospective contractors to begin the work,[4] we cannot overlook the possibility that the information was not readily ascertainable in the circumstances presented. Indeed, SJC produced evidence that some project owners would not have been willing to wait for South Bay to go through the entire bidding process from the start. Thus, a triable issue of fact

---

[4] Biagini was "quite concerned" about Foust's move to South Bay, as construction on Ross Hillsdale was "on the verge" of being started. To avoid wasting time, Biagini had collected bids himself from demolition contractors, selected one, and completed the demolition in March 2004. Foust promised him that completion of his project would not be delayed. Borelli testified that he was anxious to have Ringwood Court started. Operating Engineers was also a time-sensitive project; every month of delay would cost $10,000. The Vault was costing the same amount per month in rent, so partner-owner Mauricio Mejia "wanted to get this project moving as quick[ly] as possible." Airtech was less urgent.

exists as to whether the entire proposal for each project was indeed *readily* ascertainable—that is, whether South Bay could have replicated each offer within the short period it claimed to have needed.

■ Taken together, the parties' evidence thus suggests an issue of material fact concerning whether the project information derived independent economic value from not being generally known to competitors in the commercial construction business. Whether SJC made reasonable efforts to maintain the secrecy of this information is also subject to reasonable dispute. (Cf. *ReadyLink Healthcare v. Cotton, supra,* 126 Cal.App.4th at p. 1018 [plaintiff company took reasonable steps to protect trade secrets through nondisclosure agreement].) SJC extracted a written promise from Foust that during his employment he would not disclose any of SJC's trade secrets. In his "Confidentiality and Trade Secrets Agreement" Foust agreed that those trade secrets included "processes, compilation of information, records, specifications and customer information relating to the construction process," as well as "bidding, estimating, and costing processes," whether stored on paper or on the computer. It is true, as South Bay points out, that merely saying something is a trade secret in an employment agreement does not make it so. (See, e.g., *American Paper & Packaging Products, Inc. v. Kirgan* (1986) 183 Cal.App.3d 1318, 1325 [228 Cal.Rptr. 713] [employment agreement defining a trade secret may not be decisive]; cf. *Morlife v. Perry, supra,* 56 Cal.App.4th at p. 1522 [though labeling information a trade secret is not conclusive, it is an important factor].) But Foust acknowledged in his deposition that the promises he made in the confidentiality agreement meant that he was not to use "things that were created and learned at SJC" during his employment there.[5] He knew that SJC would not have approved of his taking client information; that was why he copied the documents secretly after working hours. The significance and sufficiency of the confidentiality agreement on the issue of whether SJC made adequate attempts to keep its prospective project information secret is for the jury to measure. If, as SJC alleged, its project material was in fact misappropriated within the meaning of section 3426.1, subdivision (b), a cause of action for a UTSA violation would have been stated. We therefore turn to the element of misappropriation.

---

[5] The agreement stated: "Employee hereby agrees that he/she will not disclose any of Employer's trade secrets, directly or indirectly, or use them in any way, either during the term of his/her employment or at any time thereafter, except as required in the course of his/her employment for San Jose Construction Co., Inc." Before signing the document, Foust had lined out the word "either" and the phrase "or at any time thereafter," thinking that this meant he was free to use anything he learned at SJC after he stopped being an employee there. As for the project binders, he believed he could take "[m]ainly format stuff. Spreadsheets, meeting minutes, change order logs. Anything that was specific to style, basically."

 In its summary judgment motion South Bay asserted that it "did not misappropriate anything." South Bay insisted in its reply that it was undisputed that the project binders were returned to SJC and never used by South Bay to solicit the project owners. There are two deficiencies in this argument. First, as discussed above, whether Foust used the information he had taken from SJC on behalf of South Bay was not undisputed. Second, under the UTSA "misappropriation" can occur through improper *acquisition* of a trade secret, not only through use.[6] On appeal, South Bay does not separately address the misappropriation element, but only insists that the absence of a trade secret vitiates the entire misappropriation cause of action. We have concluded, however, that issues of material fact exist as to both elements. South Bay was therefore not entitled to summary adjudication of the cause of action for misappropriation of trade secrets.

### b. *Intentional Interference with Prospective Economic Advantage*

 "The tort of intentional or negligent interference with prospective economic advantage imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition." (*Settimo Associates v. Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, 845 [17 Cal.Rptr.2d 757].) In order to prove intentional interference with prospective economic advantage, SJC would have to establish (1) an economic relationship with the project owners, which offered the probability of future economic benefit to SJC; (2) defendants' knowledge of this relationship; (3) defendants' intentional acts designed to disrupt that relationship; (4) actual disruption of the relationship; and (5) economic harm to SJC proximately caused by defendants' acts. (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1152 [17 Cal.Rptr.3d 289, 95 P.3d 513].) With respect to the third element, a plaintiff must show that the defendant engaged in an independently wrongful act. (*Ibid.*; see also *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740] [defendant's interference must be wrongful by some legal measure beyond the fact of the interference itself].) It is not necessary to prove that the defendant acted with the specific intent, or purpose, of disrupting the

---

[6] Section 3426.1, subdivision (b) defines "misappropriation" as "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or [¶] (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: [¶] (A) Used improper means to acquire knowledge of the trade secret; or [¶] (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: [¶] (i) Derived from or through a person who had utilized improper means to acquire it; [¶] (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or [¶] (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or [¶] (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake."

plaintiff's prospective economic advantage. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1155–1157 [131 Cal.Rptr.2d 29, 63 P.3d 937].) Instead, "it is sufficient for the plaintiff to plead that the defendant '[knew] that the interference is certain or substantially certain to occur as a result of his action.' " (*Id.* at pp. 1156–1157, quoting Rest.2d Torts, § 766B, com. d, p. 22.) "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Id.* at p. 1159; see *Reeves v. Hanlon, supra,* 33 Cal.4th at p. 1152.) "[A]n act must be wrongful by some legal measure, rather than merely a product of an improper, but lawful, purpose or motive. " (*Korea Supply Co.,* at p. 1159, fn. 11.)

As it did with the misappropriation claim, South Bay attempted to show that SJC lost the projects through its own conduct, by firing Foust. There was no evidence, South Bay argued, that Foust solicited any of the five owners on behalf of South Bay or that these owners would have contracted with SJC without Foust as project manager. Consequently, once Foust was gone, "there no longer existed <u>any</u> economic relationship" between SJC and the project owners "that was likely to have any future economic benefit to [SJC]." South Bay supported its argument with deposition testimony and correspondence from project owners to SJC evidencing their decision to switch to South Bay in order to continue their relationship with Foust as project manager. In light of this evidence the trial court ruled that once SJC fired Foust, there was no probability that it would be awarded the construction contracts; thus, "SJC disrupted its own relationships with the Project Owners and its own prospective economic advantage."

On appeal, South Bay adheres to the position it took below. It also proffers a new argument—that SJC's claim is preempted by section 3426 et seq. because it is based on the same conduct that underlies the UTSA claim. This was not one of the grounds stated in South Bay's summary judgment motion, however, and therefore was not ruled upon by the superior court. A moving party is not entitled to summary judgment on a ground not raised in its motion, even if that ground would have been sufficient. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 67 [15 Cal.Rptr.2d 598].)

South Bay's evidence supported its argument that there was no economic relationship to disrupt once SJC terminated Foust. But SJC responded with evidence that the project owners' shift in commitment was conditioned on the promise that South Bay, through Foust, could complete the projects without excessive delay. In SJC's view, had Foust not "stole[n]" the confidential information from its files, he would have taken much longer to generate new

proposals on behalf of South Bay. Thus, the same evidence that suggested a material factual issue on the trade secrets claim created a triable issue on whether SJC had an economic relationship with the project owners which offered the probability of future economic benefit to SJC. The cause of action for intentional interference with prospective economic advantage withstood the summary judgment motion.

### c. Unfair Competition

SJC asserted both common law and statutory claims for unfair competition. It alleged that it had been damaged when defendants misappropriated its confidential information, solicited its clients, disrupted its relationship with those clients, and (in Foust's case) violated the confidentiality agreement. In moving for summary adjudication of these claims, South Bay argued that it was "axiomatic that in order for unfair competition to exist, there must be some underlying competition." Again South Bay maintained that South Bay was not competing for the projects at issue because the owners had already decided to "move their business elsewhere." South Bay pointed out that the owners reasonably demanded prices from South Bay that were comparable to those they had received from SJC, and that their projects remain on schedule; "[c]onsequently, it made perfect sense that they would follow Foust and negotiate with South Bay. The owners desired Foust's services. Foust had accumulated non-secret knowledge about the projects and could reasonably expect the subcontractors to provide South Bay with the same prices they had provided SJC. Further, South Bay had the ability and man-power to begin the projects without any appreciable delay."

While South Bay's argument is appealing, it depends on the same factual premise underlying SJC's other causes of action. SJC produced evidence demonstrating triable issues of fact as to whether Foust had "accumulated non-secret knowledge about the projects," whether Foust remained in possession of that information after he said he had returned it, and whether South Bay would have been able to "begin the projects without any appreciable delay" had Foust or South Bay not kept the information. It further seems disingenuous of South Bay to insist that once SJC fired Foust, the two companies were no longer in competition; the point SJC seeks to prove is that its inability to compete for the five projects was due to the very conduct that was wrongful. As South Bay asserted no other grounds below for summary adjudication of the unfair competition causes of action, we cannot uphold the court's ruling on these claims.

*Disposition*

The judgment for South Bay is reversed, and the matter is remanded for trial or other appropriate disposition of the third, fourth, fifth, and sixth causes of action in SJC's complaint. SJC is entitled to its costs on appeal.

Rushing, P. J., and Premo, J., concurred.