Filed 12/15/15; pub. order 1/12/16 (see end of opn.)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES G. SPEIRS et al., | |
| Plaintiffs and Appellants, | G048698 |
| v. | (Super. Ct. No. 30-2011-00508691) |
| BLUEFIRE ETHANOL FUELS, INC., et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Derek W. Hunt, Judge. Reversed and remanded with directions.

Bryan Cave, Lawrence P. Ebiner and David J. Joerger for Defendants and Appellants.

Wilson Harvey Browndorf and Marc Y. Lazo for Plaintiffs and Appellants.

\*          \*          \*

Plaintiffs held warrants (i.e., options to buy common stock from a corporation at a particular price by a particular date) issued by defendant BlueFire.[1] The warrants included an anti-dilution provision, requiring BlueFire to adjust the exercise price set in the warrants "to equal the consideration paid" by a subsequent investor for equity interests in BlueFire. But the anti-dilution provision did not apply to certain issuances of securities, as specified in a list of five categories of exceptions.

A few years after issuance of the warrants, BlueFire entered into an agreement with non-party Lincoln Park Capital Fund, LLC (Lincoln). The agreement created a corporate finance structure known to its aficionados as an "equity line of credit" or a "standby equity distribution agreement."[2] Lincoln promised to make up to $10 million available to BlueFire (including $150,000 immediately upon execution of the agreement), to be accessed at the option of BlueFire over a set period of time. In exchange, BlueFire issued common stock and warrants to Lincoln at the time the agreement was executed, and promised to issue additional common stock in exchange for any future cash received from Lincoln.

Plaintiffs sued BlueFire for breach of contract and declaratory relief when BlueFire refused to apply the warrants' anti-dilution provision to the Lincoln agreement. Plaintiffs also sued individual defendants Arnold R. Klann and Christopher D. Scott for breach of fiduciary duty. Conducting a bench trial, the court rejected the breach of fiduciary duty claim against Klann and Scott. But the court ruled the anti-dilution provision applied to the Lincoln transaction and that BlueFire had breached the warrants.

---

[1] Plaintiffs are James G. Speirs (individually, as the successor-in-interest to Quercus Trust, and as real party in interest to the James G. Speirs, SEP IRA) and James N. Speirs. Defendant BlueFire Renewables, Inc. is the successor entity of defendant BlueFire Ethanol Fuels, Inc. We will refer to both entities collectively as BlueFire.

[2] (See *Securities and Mergers & Acquisitions Bulletin, The Equity Line of Credit: A Financing Tool That is Gaining Ground in Canada* (Nov. 1, 2010) <http://www.fasken.com/en/equity-line-of-credit/> (as of Dec. 11, 2015).)

The court also reduced the exercise price for the warrants from $2.90 per share to $0 per share, and authorized plaintiffs to immediately exercise the warrants. The court did not award monetary damages to plaintiffs. The parties appealed aspects of the judgment adverse to their respective interests.

We agree the breach of fiduciary duty cause of action was unmeritorious as a matter of law; a corporation's officers do not have a fiduciary duty to warrant holders. We also agree with the court's interpretation of plaintiffs' warrants. The anti-dilution provision applies to the Lincoln agreement and stock issuances to Lincoln resulting from that agreement. But substantial evidence does not support the court's decision to reduce plaintiffs' exercise price to $0. We therefore reverse the judgment and remand for retrial solely on the proper remedy for BlueFire's breach of contract.

FACTS

BlueFire was formed and registered as a publicly traded company in 2006. Its business is transforming organic materials into ethanol fuels. At all relevant times, defendant Klann was BlueFire's chief executive officer, a member of BlueFire's board of directors, and an owner of a substantial percentage of BlueFire (e.g., 47 percent as of February 2011). Defendant Scott was chief financial officer of BlueFire at certain relevant time periods.

Plaintiffs are a father-son duo of investors. Since 2006, plaintiffs have owned shares of BlueFire common stock. Before trial began, plaintiff James G. Speirs ("Jamie") owned approximately 5 percent of BlueFire.

3

*Plaintiffs' Warrants*

At the time of trial, plaintiffs held 5,740,741 warrants issued by BlueFire.[3] All of the warrants contained the same terms. The warrants entitled plaintiffs "to purchase up to" 5,740,741 shares of BlueFire's common stock. The "Exercise Price" (i.e., the price at which the shares could be purchased) was $2.90 per share. The warrants could be "exercised in whole or in part" by December 14, 2012 (the "Expiration Date").

Section 9 of the warrants, entitled "Adjustment of Exercise Price and Number of Shares," included various protections for holders against subsequent events affecting the value of the warrants, including subsection 9.4 entitled "Anti-Dilution Protection."[4] The first two sentences of the anti-dilution provision stated: "This Warrant is subject to 'full-ratchet' anti-dilution protection in relation to the issuance by [BlueFire] (other than Excluded Issuances) of any additional shares of stock, options, warrants or any securities exchangeable into any of the foregoing, (the 'Additional Shares'). If [BlueFire] issues any Additional Shares in exchange for consideration in an amount per Additional Share less than the Exercise Price in effect immediately prior to such issuance or sale of such Additional Share, then the Exercise Price shall be adjusted to equal the consideration paid per Additional Share."

---

[3] We ignore inconsequential complexities in the record pertaining to the issuance of the warrants and the history of plaintiffs' acquisition of the warrants. It is noteworthy, however, that Jamie obtained the vast majority of the warrants (5,555,556) for $30,000 in October 2010.

[4] Other subsections specifically addressed remedies for the warrant holders in the event of mergers, reclassification of securities, dividends, and stock splits. Another subsection, "Other Changes," stated more generally that "If any other event occurs as to which the other provisions of this Section 9 are not strictly applicable or if strictly applicable, would not fairly protect the rights of the Holder in accordance with such provisions, then the Company shall make an adjustment in the . . . the Exercise Price . . . so as to protect such rights as aforesaid."

But the next sentence of subsection 9.4 excluded five types of issuances from anti-dilution protection, including two exceptions defendants deemed applicable to the Lincoln transaction. "Excluded Issuances' shall mean any equity securities (or options, warrants or securities convertible into equity securities) issued . . . (ii) to parties that are strategic partners investing in connection with a commercial relationship, or providing [BlueFire] with equipment leases, real property leases, loans, credit lines, guaranties or similar transactions approved by the Board, (iii) in connection with a merger or acquisition or in connection with a joint venture or other strategic or commercial relationship approved by the Board . . . ."

Subsection 9.6 set forth the obligations of BlueFire upon an issuance of shares requiring an adjustment of the warrants' exercise price: "Whenever the Exercise Price . . . shall be adjusted, [BlueFire] shall issue a certificate signed by [an officer] setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated and the Exercise Price . . . after giving effect to such adjustment, and shall cause a copy of such certificate to be mailed . . . to the Holder." Section 4 described the procedural mechanism whereby plaintiffs could exercise the warrants, including the submission of a "Warrant Exercise Form," accompanied by payment of the "Exercise Price."

The warrants chose New York law as applicable (though the parties freely cite California cases and make no contention that the resolution of the issues on appeal turns on the choice of law provision) and included an integration clause ("this Warrant . . . contains the entire agreement of the parties, and supersedes all existing negotiations, representations or agreements and other oral, written, or other communications between them concerning the subject matter of this Warrant").

*The Lincoln Agreement and Ensuing Issuances of Securities*

In January 2011 (i.e., about two years before the warrants' expiration date), BlueFire and Lincoln executed a document entitled "PURCHASE AGREEMENT," which was approved by BlueFire's board of directors. The agreement succinctly described its purpose: BlueFire "wishes to sell to [Lincoln], and [Lincoln] wishes to buy from [BlueFire], up to Ten Million Dollars ($10,000,000) of [BlueFire's] common stock . . . ."

The key dispute at trial was whether the Lincoln agreement was an excluded issuance under subsection 9.4 of plaintiffs' warrants. We highlight the essential features of the agreement and its implementation after execution.

First, immediately upon execution of the agreement, BlueFire issued 600,000 shares of common stock ("Initial Commitment Shares") to Lincoln. The agreement characterized this issuance of shares as "consideration for [Lincoln] entering into [this] Agreement." The agreement did not identify the monetary value of this $10 million commitment to BlueFire. No cash was received by BlueFire as payment for the Initial Commitment Shares.

Second, immediately upon execution of the agreement, BlueFire sold to Lincoln 428,571 "Initial Purchase Shares" of common stock, along with 428,571 warrants with an exercise price of $0.55, in exchange for $150,000. This $150,000 was the first portion of the $10 million commitment made by Lincoln. Ignoring the value of the warrants and viewed in isolation from the remainder of the Lincoln agreement, this transaction amounted to a purchase of common stock at 35 cents per share ($150,000/428,571). This is how the sale of the "Initial Purchase Shares" was characterized in BlueFire's form 10-K filing with the Securities and Exchange Commission (428,571 "[c]ommon shares issued for cash at $0.35 per share in January 2011") and in a BlueFire press release ("Upon signing the agreement, [Lincoln] invested $150,000 in BlueFire as an initial investment under the agreement at $.35 per share").

6

Third, moving past January 2011, BlueFire had the right to sell up to $10 million (actually, $9,850,000, after deducting the $150,000 already paid) of common stock to Lincoln, and Lincoln had the obligation to buy shares of common stock from BlueFire upon demand. These future purchases were subject to various procedural and substantive conditions; assuming the conditions were met, the price of the shares was to be set based on future circumstances (including "the prevailing market prices").[5]

From May 2011 to January 2012, BlueFire received $235,000 from Lincoln. In exchange, 1,354,842 additional shares of common stock (including 12,183 additional "commitment" shares) were issued to Lincoln. According to a form 10K filed by BlueFire, common shares were being issued for cash during this time period at prices ranging from 29 cents to 15 cents per share. The first quarter of 2012 was the last time Lincoln made any stock purchases from BlueFire.

*The Alleged Breach*

Jamie met with Klann and Scott twice at the end of January 2011, demanding that BlueFire ratchet down the warrants in response to the Lincoln agreement. Defendants refused to honor plaintiffs' demand.

Plaintiffs did not present completed warrant exercise forms pursuant to section 4 of the warrants in January 2011. Of course, defendants did not comply with the requirements of section 9.6 (to notify plaintiffs of the ratchet down event, the new exercise price, and the method utilized to calculate that price) because they took the position that issuances to Lincoln were excluded from plaintiffs' anti-dilution protection. Plaintiffs later submitted warrant exercise forms with a price of $0 on December 4, 2012,

---

[5] Plaintiffs' counsel stated at oral argument that either party could unilaterally revoke the financing agreement. This is inaccurate. Certainly, BlueFire was not obligated to sell additional shares to Lincoln. But Lincoln was obligated to purchase BlueFire shares, assuming specified conditions were met.

eight days before their deadline to do so. BlueFire declined to honor the attempted exercise, implicitly rejecting plaintiffs' contention that the Lincoln agreement triggered anti-dilution protection resulting in an exercise price of $0.

*Extrinsic Evidence Regarding Applicability of Anti-Dilution Provision*

Jamie's understanding of the full-ratchet anti-dilution provision in the warrants was that it acted as the "sweetener of all sweeteners." "It would be used typically to protect an early investor . . . in the event that another investor got . . . a 'better deal.' So if [a later investor was] issued shares in an amount less than the exercise price of these warrants, these warrants would . . . ratchet down to equal that lowest issuance of stock from the company." Klann, conversely, claimed the warrants were designed to raise additional capital — an additional $15 million or so in addition to the approximately $15 million invested when the warrants were issued. Scott insisted the exclusions to the anti-dilution provision "had to be fairly broad so as not to hamper [BlueFire] from getting additional capital."

Jamie also testified about an occurrence from which one might infer defendants actually believed the Lincoln agreement was *not* an excluded issuance under subsection 9.4 of the warrants. Just before execution of the Lincoln agreement in January 2011, Klann offered Jamie the opportunity to make a loan to BlueFire with identical terms to those received by Klann himself for a similar loan. The term sheet for this proposed loan included a waiver of the warrants' anti-dilution rights both as to the proposed loan and as to a pending equity line of credit transaction (i.e., what we now know as the Lincoln agreement): "Investor also acknowledges that although [BlueFire's] contemplated standby equity line with an as yet unnamed institutional investor ("SEL") would be considered an 'Excluded Issuance' as defined in Section 9.4 of the 2007 Warrants, Investors will also formally waive their ratchet rights on the SEL transaction as an inducement for [BlueFire] to enter into this transaction." Jamie was suspicious about

Scott's motives, who pressured him to sign the waiver while simultaneously saying the proposed equity line of credit transaction was an excluded issuance under subsection 9.4 of the warrants. Jamie crossed out the waiver term before signing the term sheet, and BlueFire declined to accept the loan. Scott asserted this episode did not reflect bad faith, but rather an attempt to avoid a lawsuit.

Expert testimony was offered to assist the court in its interpretation of the applicability of the anti-dilution provision to the Lincoln transaction. With regard to exception (ii) to the anti-dilution provision, plaintiffs' experts discussed the differences between equity lines of credit and traditional lines of credit. In essence, this testimony made clear that the Lincoln transaction "had nothing to do with a loan of money." "An equity line of credit . . . is a commitment by an investor to purchase stock, generally over time, as opposed to one single purchase of stock[,] usually . . . at varying prices at the time that each increment or tranche is called down or invested." One hallmark of an equity line of credit, as opposed to a debt-based line of credit, is that it can cause "substantial dilution as a result of the draw-downs on the equity line."

Scott and defendant's expert, on the other hand, testified that an equity line of credit was in fact a "credit line" or "similar transaction" because it has the same characteristics, purpose, and function as a traditional credit line — access to liquidity at the option of the party needing liquidity, an obligation imposed on the other party to provide liquidity, a maximum dollar amount, and a limited duration.

With regard to the terms "strategic partner" and "strategic relationship" (used in exceptions (ii) and (iii) respectively), one of plaintiff's experts testified these terms were "close enough" to be considered the same thing. Plaintiff's other expert defined strategic partnership as an "arrangement between two companies — usually a large company and a small company — in which the large company has managerial[,] technological[, or] marketing resources, and the small company has some technology or product that would be useful to the large company and to the small company to jointly

9

develop and market." This expert opined that Lincoln was not a strategic partner of BlueFire; the relationship between the two companies was that of a "private equity fund" investing in a company. The same expert said the exclusions were designed to apply to stock issuances "incidental to and not the principal purpose of [a] transaction . . . ."

Klann "considered [Lincoln] initially to be a very strategic relationship" because of BlueFire's need for a funding source to meet government loan guarantee requirements. According to Klann, Lincoln was the only company willing to give a $10 million commitment to BlueFire at the time of the transaction. But at his deposition, Klann did not identify Lincoln as a strategic partner, instead identifying as strategic partners several other firms acting as BlueFire's long-term suppliers, contractors, and buyers of BlueFire's biofuels.

*Evidence Pertaining to Consideration Provided in Lincoln Transaction*

Plaintiffs posited that $0 was paid by Lincoln for the 600,000 Initial Commitment Shares and the transfer of these shares to Lincoln obligated BlueFire to ratchet down the exercise price in plaintiffs' warrants to $0 per share. In part, plaintiffs' position was based on an interpretation of the language of section 9.4: "If [BlueFire] issues any Additional Shares in exchange for *consideration in an amount per Additional Share* less than the Exercise Price in effect immediately prior to such issuance or sale of such Additional Share, then the Exercise Price shall be *adjusted to equal the consideration paid per Additional Share*." (Italics added.) By plaintiff's logic, a commitment to provide capital in the future, no matter how valuable, is not an amount "paid per Additional Share." BlueFire was free to exchange common stock for an intangible commitment of future capital availability, but if it took this step it was required to reduce plaintiffs' exercise price to $0.

In further support of their contention, plaintiffs pointed to BlueFire's accounting treatment of the "Initial Commitment Shares." BlueFire "booked" the Initial

10

Commitment Shares at "no value, at no cost to themselves to the issuance." A BlueFire accounting entry listed the $600 par value as the cost of the 600,000 Initial Commitment Shares, then set forth an offsetting negative $600 entry for additional paid-in capital. Plaintiff's expert acknowledged, however, that book value is not the same thing as economic value. Plaintiffs' expert also agreed "the 600,000 initial commitment shares were not worth zero" when they were issued to Lincoln.

BlueFire contended consideration can be many things, and Lincoln's commitment to provide up to $10 million in capital was valuable consideration. BlueFire's expert characterized financing placement rights as "a contractual intangible benefit." He identified the value of the $10 million commitment as $300,000. He reasoned that the market value of the BlueFire shares was 50 cents per share (600,000 shares x $0.50 = $300,000) at the time BlueFire and Lincoln agreed to a term sheet. The market price at the time the commitment shares were actually transferred was 40 cents per share. If this value were used to value Lincoln's commitment (600,000 shares x $0.40), the commitment would be valued at $240,000. This $240,000 figure was featured in a "journal entry" valuing the "line of credit economic benefit"; this entry was purportedly made around the time the Lincoln agreement was executed.

BlueFire also contended that the $150,000 cash provided at execution and the commitment to provide more cash in the future should be considered together as part of one transaction. Viewed in this manner, BlueFire exchanged 1,028,571 shares of stock (600,000 Initial Commitment Shares + 428,571 Initial Purchase Shares) for a combined value of either $450,000 ($150,000 + $300,000) or $390,000 ($150,000 + $240,000). Viewed as a single transaction, the higher value comes out to 44 cents per share ($450,000 / 1,028,571) and the lower value comes out to 38 cents per share ($390,000/1,028,571).

11

*Conflicting Evidence Regarding Monetary Damages Suffered by Plaintiffs*

Plaintiffs also argued they suffered damages as a result of BlueFire's breach of contract. Plaintiffs testified they would have immediately sold at least some of the shares they would have obtained had BlueFire allowed them to exercise the warrants in January 2011. As of the execution of the Lincoln agreement, BlueFire's closing stock price was $0.40 per share, and its 21-day moving average price was $0.442 per share. By the time of trial, the stock price was down to 12 cents per share. One of plaintiffs' experts opined that, as of the time of trial, plaintiffs suffered $1,848,518.60 in damages (($0.442 - $0.12) x 5,740,741 warrants) as a result of BlueFire's failure to allow exercise of the warrants at $0.00 in January 2011.

Defendants argued plaintiffs did not suffer any breach of contract damages. One angle of attack was levied against the notion that plaintiffs would have immediately sold BlueFire shares for a profit in or around January 2011. Plaintiffs were long-term investors in BlueFire stock who cumulatively held 1.6 million shares at the time of trial. Neither plaintiff had sold any of their BlueFire common stock in the two years prior to trial. Jamie testified he would have sold "a lot" of shares to get his "head back above water" with regard to his investment in BlueFire. But Jamie agreed it was "very difficult to go back in time and see exactly what [he would] have done."

A second angle of attack was brought against the assumptions made by plaintiff's damages expert. Both the issuance of more than five million shares of common stock (added to the existing 28 million shares) and an attempt to quickly sell those shares would have "utterly collapsed" the stock price, making it improbable plaintiffs actually would have attempted to liquidate their position.

*Court's Rulings*

At the end of plaintiffs' case-in-chief, the court granted defendants' motion for nonsuit on the breach of fiduciary duty cause of action.

After the completion of the trial, the court found for plaintiffs on the first and third causes of action, for breach of contract and declaratory relief. "The full ratchet anti-dilution protection offered by the warrants at issue would be rendered illusory by defendants' proposed interpretation." The court declared "plaintiffs' warrants are entitled to anti-dilution protection under the terms of the warrants and . . . plaintiffs are accordingly entitled to immediate exercise of said warrants . . . at the effective price per share of $0.00." But the court awarded no monetary damages to plaintiffs. The court entered judgment accordingly.

Following the court's ruling, BlueFire was compelled by the court to comply with the judgment notwithstanding the pending appeal. Acting under protest, BlueFire issued 5,740,741 shares of common stock to plaintiffs at a price of $0.00.

We grant the parties' respective motions to admit new documentary evidence on appeal relevant to the issue of whether BlueFire's appeal is moot. (Cal. Rules of Court, rule 8.252(c)(3).) Plaintiffs contend that BlueFire's appeal is moot because the judgment has been enforced — i.e., the warrants have been exercised by plaintiffs at a price of $0.00. We reject plaintiffs' contention because appellate proceedings can provide effective relief to BlueFire. When a judgment is reversed, Code of Civil Procedure section 908 authorizes courts to return the parties "'so far as possible to the positions they occupied before the enforcement of or execution on the judgment or order.'" (See *Munoz v. MacMillan* (2011) 195 Cal.App.4th 648, 657.) One possible remedy, assuming plaintiffs are still in possession of the 5,740,741 shares of stock, is to order plaintiffs to return those shares to BlueFire.

13

DISCUSSION

*Court Properly Rejected Breach of Fiduciary Duty Claim*

The operative complaint alleged Klann and Scott, BlueFire officers (and, at least with regard to Klann, a majority shareholder in combination with other related shareholders), owed fiduciary duties of loyalty to plaintiffs because of plaintiffs' status as BlueFire minority shareholders.

According to the allegations of the operative complaint, Klann and Scott allegedly violated their fiduciary duties to plaintiffs in two ways. First, they facilitated a loan from a Klann-related entity to BlueFire, the terms of which personally enriched Klann. Prior to trial, plaintiffs abandoned their claim for damages arising from this transaction, recognizing it might be brought at a later time as a derivative claim.

Second, as relevant to this appeal, Klann and Scott allegedly breached their duty of loyalty by "[s]oliciting, arranging, contracting, and/or facilitating the issuance of voting shares and convertible warrants to [Lincoln] at a fraction of the share and warrant values of those held by [plaintiffs], in violation of the anti-dilution provision of paragraph 9.4 of the WARRANTS, thereby breaching said defendants' duty of loyalty to not dilute [plaintiffs'] warrants." Plaintiffs' alleged damages consisted of "[b]eing deprived of the full ratchet down price of the warrants . . . ; and (2) [i]ncurring the opportunity costs associated with being unable to liquidate the true value of said warrants."

Thus, despite identifying the source of duty in plaintiffs' status as minority common shareholders, plaintiffs *do not* claim the breach of duty was defendants' authorization of the Lincoln transaction. Nor do plaintiffs identify the harm caused by the breach as the dilution of their shares of common stock. Instead, plaintiffs allege Klann and Scott wrongfully refused to apply the anti-dilution protection provided in plaintiffs' *warrants* to the Lincoln transaction.

14

The theory pursued at trial was consistent with the complaint. Plaintiffs point to the following evidence in support of their contention that the court wrongly granted defendants' nonsuit motion as to breach of fiduciary duty: (1) Scott and Klann (unsuccessfully) tried to "hoodwink" plaintiffs into waiving their anti-dilution rights *in the warrants*; (2) Scott and Klann concealed the nature of the Lincoln transaction from plaintiffs when they tried to negotiate the waiver of the anti-dilution rights *in the warrants*; (3) Scott and Klann insisted the Lincoln transaction was an excluded issuance from the anti-dilution clause *in the warrants*; (4) Klann and Scott refused to honor the anti-dilution clause *in the warrants*; and (5) Klann protected his own rights as a majority common shareholder by refusing to honor plaintiffs' *warrant rights*, because allowing plaintiffs to exercise their *warrant rights* would dilute the value of stock held by common shareholders. Plaintiffs acknowledge that "the harm to Plaintiffs — Klann's and Scott's deliberate denial of their Anti-Dilution Protection — was to the *benefit* of other shareholders. By not honoring Plaintiffs' full-ratchet anti-dilution rights, Klann and Scott prevented the other shareholders from having their interests diluted when Plaintiffs converted their Warrants into over 5.7 million shares of common BlueFire stock at zero cost, thereby dramatically increasing Plaintiffs' ownership interest in BlueFire while simultaneously decreasing the other shareholders' ownership interests." Plaintiffs, in their role as common shareholders, are necessarily included within this group of "other shareholders" that benefitted from the breach alleged.

Plaintiffs did not attempt to prove that the Lincoln transaction personally benefitted BlueFire insiders. Plaintiffs did not attempt to prove that the Lincoln transaction was unnecessary (i.e., BlueFire did not need a commitment to provide up to $10 million of capital) or that a better deal was available with another investor or lender. Plaintiffs did not attempt to prove that the decision to enter the Lincoln transaction fell outside the business judgment rule. Plaintiffs did not attempt to prove the Lincoln

15

transaction caused them to lose money on their common stock (e.g., the value of the common stock dropped a particular amount as a result of the Lincoln transaction).

The warrants did not prohibit the issuance of additional shares to new investors like Lincoln. The warrants did not even prohibit the issuance of additional shares to new investors at a price below the designated exercise price in the warrants. The warrants only prohibited the issuance of additional equity shares of BlueFire at a price below the designated exercise price in the warrants, without ratcheting down plaintiffs' exercise price to match the terms offered to the new investors. The anti-dilution clause in the warrants protected against dilution of the warrants; it did not protect against dilution of common shares as a result of BlueFire raising new capital.

The parties debate numerous issues with regard to the fiduciary duty cause of action, but we affirm based on the most straightforward ground: Klann and Scott did not owe a fiduciary duty to warrant holders, which is the role in which plaintiffs were allegedly harmed by defendants' actions. (See *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1599 [existence of a fiduciary duty is a question of law].)

"[S]tock warrants are contracts entitling the holder to purchase a specified number of shares of stock for a specific price during a designated time period." (*Reiss v. Financial Performance Corp.* (N.Y.Ct.App. 2001) 764 N.E.2d 958, 960.) "A warrantholder is not a stockholder. Warrantholders have paid for an option. They have a choice: whether to take an investment or not. A warrantholder only becomes a shareholder by investing something of value that meets the exercise terms of the warrant. The United States Supreme Court has recognized that a warrantholder's 'rights are wholly contractual' and that a warrantholder '"does not become a stockholder, by his contract, in equity any more than at law."'" (*Aspen Advisors LLC v. United Artists Theatre Co.* (Del. 2004) 861 A.2d 1251, 1262-1263, fn. omitted; see *Daly v. Yessne* (2005) 131 Cal.App.4th 52, 61 [contractual arrangement entitling party to buy stock in a company does not make party a stockholder].) As stated in the warrants at issue here,

16

"Prior to the exercise of the Warrant, the Holder, in its capacity hereunder, shall not, by virtue hereof, be entitled to any rights as a shareholder of the Company, either at law or in equity, and the right of the Holder, in its capacity hereunder, are limited to those expressed in this Warrant."

Hence, a fiduciary duty is not owed by a corporation or its insiders to warrant holders. (*Daly v. Yessne*, *supra*, 131 Cal.App.4th at p. 63 [board owed employee stock option holder "no fiduciary duty" before she had exercised options, "thus precluding her complaint regarding dilution"]; *BHC Interim Funding, L.P. v. Finantra Capital* (S.D.N.Y. 2003) 283 F.Supp.2d 968, 989 ["Under either California or New York law, an option holder, unlike a shareholder, is not owed a fiduciary duty by a corporation's officers"]; *Simons v. Cogan* (Del. 1988) 549 A.2d 300, 304 [convertible debenture holders could not bring breach of fiduciary duty claim].) With regard to their warrant rights, plaintiffs' causes of action and remedies were appropriately limited to breach of contract and declaratory relief.

Plaintiffs cite authorities pertaining to fiduciary duties owed to minority common stock holders (e.g., *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108), but these authorities are plainly inapplicable to warrant holders. (See *Pittelman v. Pearce* (1992) 6 Cal.App.4th 1436, 1442-1446 [rejecting contention that California should extend fiduciary duty protection owed to minority shareholders to convertible bond holders].) It is true plaintiffs owned minority stakes in BlueFire common stock. It is also therefore true that BlueFire's corporate insiders were obligated to refrain from enriching majority shareholders at the expense of the minority shareholders. But plaintiffs' allegations of wrongdoing pertain to the abuse of their contract rights as warrant holders, not to alleged malfeasance against plaintiffs' interests as common stock shareholders. These distinct legal relationships — (1) the fiduciary relationship of corporate insiders to minority shareholders and (2) the contractual relationship of corporations and warrant holders — should not be conflated, even if the same individuals are both minority

17

shareholders and warrant holders.[6] The evidence and argument at trial was *not* about the effect of the Lincoln transaction on the price of BlueFire stock; the evidence and argument at trial was about attempts to convince plaintiffs to waive their anti-dilution protection and the defendants' refusal to apply the anti-dilution clause to the Lincoln transaction. The court correctly granted nonsuit to Klann and Scott on the fiduciary duty cause of action.[7]

---

[6] What if BlueFire had purchased real property from plaintiffs in a separate transaction? Would one say that Klann and Scott had a fiduciary duty to plaintiffs in connection with this transaction because plaintiffs were minority shareholders in BlueFire?

[7] Everything in the record suggests the Lincoln transaction was completed at arms' length, and did not amount to Klann and Scott enriching themselves by transferring equity securities to Lincoln for inadequate consideration. Assuming plaintiffs *had* pleaded and proved a common stock dilution claim based on the sale of BlueFire securities for inadequate consideration, we would be forced to decide whether such a claim could be brought only as a derivative claim on behalf of BlueFire. (See *Schuster v. Gardner* (2005) 127 Cal.App.4th 305, 312.) Arguably, such a claim would need to be brought derivatively on behalf of the corporation, rather than as individual shareholder suits. "An action is derivative if '"the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance of distribution among individual holders . . . ."'" (*Id.* at p. 313.) A corporation, or the whole body of its stock, is harmed by a giveaway of common stock for inadequate consideration. (*Id.* at p. 316 [issuance of new shares to fund "'ill-conceived acquisition spree'" was derivative claim].) "A claim for wrongful equity dilution is premised on the theory that the corporation, by issuing additional stock for inadequate consideration, made the complaining stockholder's investment less valuable. . . . [D]ilution claims are 'not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction of the value of the entire corporate entity, of which each share of equity represents an equal fraction.'" (*Feldman v. Cutaia* (Del. 2008) 951 A.2d 727, 732; but see *Gentile v. Rossette* (Del. 2006) 906 A.2d 91, 99-100 [majority shareholder's issuance of shares to self without adequate consideration can give rise to direct claim].) We need not decide, however, whether a hypothetical claim not actually made by plaintiffs in this case should be brought as a derivative or direct lawsuit.

18

*Anti-dilution Provision Applies to Lincoln Transaction*

The next issue is one of contract interpretation. Did the court correctly determine plaintiffs were entitled to a reduction of the exercise price in their warrants "to equal the consideration paid per" share by Lincoln, or was the Lincoln transaction an excluded issuance?[8]

"Our review of the trial court's interpretation of a contract generally presents a question of law for this court to determine anew. [Citation.] 'The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. [Citation.] The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict. However, where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence.'" (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 713.)

"'It is well-settled that when interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties, to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized' [citation]. 'A contract should not be interpreted in such a way as would leave one of its provisions substantially without force or effect' [citations]." (*Yonkers Contracting Co., Inc. v. Romano Enterprises of New York, Inc.* (N.Y. 2007) 835 N.Y.S.2d 364-365.)

---

[8] We reserve the question of whether the court appropriately reduced the exercise price to $0 for later in this opinion.

The anti-dilution provision at issue applied generally to issuances of "stock, options, warrants or any securities exchangeable into any of the foregoing." The essence of the anti-dilution protection was that, after December 2007 and until December 2012, plaintiffs were entitled to a reduction of the exercise price originally stated in the warrants ($2.90) to match any lower consideration paid per share by an equity investor (or debt investor with convertibility rights).

Plaintiffs' warrants were not structured to provide anti-dilution protection only in limited, specified circumstances. (Cf. *Amaranth LLC v. National Australia Bank Ltd.* (N.Y. 2007) 835 N.Y.S.2d 177 [warrants "cannot be reasonably read to mandate anti-dilution except under the conditions plainly specified"].) Instead, anti-dilution protection was the general rule, with the following issuances excepted: "(i) to employees, officers, directors, contractors, consultants or advisers approved by the Board, (ii) to parties that are strategic partners investing in connection with a commercial relationship, or providing [BlueFire] with equipment leases, real property leases, loans, credit lines, guaranties or similar transactions approved by the Board, (iii) in connection with a merger or acquisition or in connection with a joint venture or other strategic or commercial relationship approved by the Board, (iv) upon the exercise of currently outstanding convertible securities, options and warrants, and (v) in connection with any public offering."

BlueFire contends exceptions (ii) and (iii) apply to the BlueFire transaction. Before turning to the exceptions advanced by BlueFire, we note that exceptions (i), (iv), and (v) all make sense as true exceptions to the general rule, rather than a way of taking away with the left hand what one has just given with the right. Exception (i) applies to employees and similar individuals who were compensated with stock or stock options, a group obviously distinguishable from a typical equity investor. Exception (iv) applies to predecessor investors; these transactions were already on the books and could not be said to dilute the value of the warrants obtained by plaintiffs. Exception (v) is a public

20

offering. A public offering, while potentially dilutive, is a different danger than private placement investors being offered superior terms to those given to plaintiffs. And presumably, plaintiffs would be able to purchase BlueFire securities at a public offering.

Exception (ii) excludes issuances "to parties that are strategic partners investing in connection with a commercial relationship, or providing [BlueFire] with equipment leases, real property leases, loans, credit lines, guaranties or similar transactions approved by the Board." BlueFire suggests exception (ii) applies to *any party* (not just a strategic partner)[9] that provides a "line of credit" to BlueFire or enters into a "similar transaction" with BlueFire, and that Lincoln's equity line of credit was a "similar transaction" to a line of credit.

We disagree with BlueFire's interpretation and application of exception (ii) for several reasons. First, a grammatical reading of the warrants dictates that exception (ii) applies only to "strategic partners," not to any party providing a line of credit. As the court observed with regard to the "parallel draftsmanship" utilized in the warrants, there are two gerunds in exception (ii) — "investing" and "providing" — and "the modifier for each of those gerunds is 'parties that are strategic partners.'"

Second, a reasonable interpretation of exception (ii) limits its applicability to "strategic partners" providing something other than a pure equity investment in BlueFire, such as technical expertise or a long-term commitment to purchase BlueFire's energy products. BlueFire's interpretation is unreasonable because it supposes that any party purchasing equity interests in a transaction structured to resemble a loan or credit line would be exempt from the anti-dilution provision. As made apparent by the unorthodox transaction completed with Lincoln, there is no end to the creativity brought to bear on problems of corporate finance. (See *Mathews v. Kidder, Peabody & Co., Inc.* (3d Cir. 2001) 260 F.3d 239, 248, fn. 12 ["modern financial markets, and the widespread

___

[9] On appeal, BlueFire has abandoned its contention that Lincoln was a "strategic partner" of BlueFire.

21

use of complicated derivative instruments, have blurred the once-sharp distinction between debt and equity"].) BlueFire's interpretation would allow exception (ii) to swallow the general anti-dilution rule, so long as BlueFire was clever enough in structuring transactions with equity investors. The best interpretation of exception (ii) is that it was designed to apply to incidental issuances of equity securities to strategic partners, not to any party providing an "equity line of credit" (or, perhaps, a "loan" to be "repaid" with shares of common stock).

Similarly, exception (iii) — "in connection with a merger or acquisition or in connection with a joint venture or other strategic or commercial relationship approved by the Board" — makes sense within the scheme of the anti-dilution protection provision only if "strategic relationship" means something more than an equity investor like Lincoln. The essentials of the Lincoln transaction (memorialized in a "PURCHASE AGREEMENT") are Lincoln providing money to BlueFire in exchange for equity interests in BlueFire. Pointing out that this financing scheme was a strategy and noting that this type of transaction is sometimes referred to as an "equity line of credit" does not change the underlying reality of the investment. Securing sufficient capital to continue operations and pursue profitable ventures is always a strategy engaged in by corporations. "Strategic relationship" must nonetheless mean something more than an equity investor in a private placement.[10] And the use of a transaction structure somewhat resembling a line of credit (with equity substituted for debt) does not transform an equity investor into a strategic partner or strategic relationship.

---

[10] For example, one would suppose that Arkenol, Inc., a firm that licenses its technology to convert cellulose and waste materials into ethanol to BlueFire, would qualify as a strategic partner or strategic relationship.

22

In sum, we agree with the court's interpretation of the warrants. The warrants are not ambiguous as to the applicability of the anti-dilution provision to the Lincoln transaction. The exceptions cannot apply under a fair reading of the warrants. Defendants' proposed interpretation of the warrants would render the anti-dilution protection largely illusory. Such an interpretation would not only violate general principles of contract interpretation, but would also conflict with section 9.5 of the warrants, which (as quoted above in footnote 4) indicates warrant holders should be provided with the benefit of their contractual protections even if specific protections "are not strictly applicable." Plaintiffs were therefore entitled to a reduction of the exercise price "to equal the consideration paid per Additional Share" by Lincoln. BlueFire breached section 9.6 of the warrants by not notifying plaintiffs of a reduction in the exercise price of the warrants following the execution of the Lincoln agreement.

Even if we are mistaken and the warrants are ambiguous as to the interpretive questions presented, there was substantial evidence supporting the court's interpretation of the relevant phrases in the warrants. Conflicting extrinsic evidence (both percipient and expert testimony, and various exhibits) was admitted to assist the court in interpreting the meaning of the anti-dilution provision and the exceptions thereto. In particular, witnesses testified regarding the purpose of section 9.4 of the warrants, whether the Lincoln transaction was a "credit line" or a "similar transaction," and the meaning of the phrases "strategic partner" and "strategic relationship." If all or some portion of section 9.4 was ambiguous, there is substantial evidence supporting the court's conclusion that the Lincoln transaction was not an excluded issuance.

*Substantial Evidence Does Not Support Reducing the Exercise Price to $0*

The warrants state that upon purchase of additional securities, "the Exercise Price in effect shall be adjusted to equal the consideration paid per" share. Plaintiffs contend (and the court may have agreed — the record is unclear) that, as a matter of contract interpretation, the anti-dilution provision means only money directly paid in exchange for securities should count toward establishing a new exercise price for their warrants. In other words, regardless of whether the $10 million capital commitment was worth *something*, it did not count as "consideration paid per" share. According to plaintiffs' interpretation of the warrants, the only reasonable conclusion is to reduce the exercise price to $0.

We disagree with plaintiffs' interpretation of the warrants. "Consideration consists of either a benefit to the promisor or a detriment to the promisee. It is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him." (*Anand v. Wilson* (N.Y. 2006) 821 N.Y.S.2d 130.) The more reasonable interpretation of the phrase "adjusted to equal the consideration paid per" share is that consideration might include any number of things, including the present value of a commitment to provide up to $10 million in capital in the future. This interpretation is also supported by section 9.6 of the warrants, which requires BlueFire to notify the warrant holders of "the method by which such adjustment [of the exercise price] was calculated . . . ." This phrasing implies that valuing consideration paid for securities might not always be as simple as dividing the amount of money paid by the number of shares purchased.[11]

The issue then becomes one of substantial evidence. What was the economic value of Lincoln's $10 million commitment in the context of the terms and

---

[11] Here, of course, BlueFire breached the warrants by not describing its method of calculation or completing this calculation for plaintiffs following the execution of the Lincoln agreement.

24

conditions of the agreement executed by Lincoln and BlueFire, and the circumstances in which BlueFire found itself in January 2011?  As set forth above, there is substantial evidence for a number of answers to this question — 50 cents per share (the value of the 600,000 shares at the time BlueFire and Lincoln committed to their agreement), 40 cents per share (the value of the 600,000 shares at the time of delivery), 44 cents or 38 cents per share (combinations of the two facets of the Lincoln agreement occurring immediately upon execution), or perhaps some lesser amount.[12]  Another option supported by the evidence is 35 cents per share (the price paid per share for the Initial Purchase Shares, ignoring the warrants also issued to Lincoln as part of this transfer).  But there is not substantial evidence for assigning a value of $0 to the $10 million commitment made by Lincoln.  BlueFire's accounting entries referencing the 600,000 Initial Commitment Shares reflected technical accounting concepts (e.g., the par value of the 600,000 Initial Commitment Shares, the paid-in capital for these shares, the $0 cost for BlueFire to issue the shares).  These entries had no connection to economic reality.  And plaintiff's damages expert's opinion was based on the accounting treatment of the transaction, not the economic reality of the value of the consideration.[13]

---

[12]     We disagree with BlueFire that the implicit valuation of the $10 million Lincoln commitment by BlueFire's board of directors was conclusive for purposes of plaintiffs' warrant rights.  It is preposterous to suggest that a party with contract rights adverse to those of BlueFire and its common shareholders (like plaintiffs and their warrants) is bound by a unilateral determination made by BlueFire's board of directors affecting a provision of the contract.  As explained above, this case is not about plaintiffs seeking damages based on the harm done to the value of the common stock by the Lincoln transaction.

[13]     BlueFire contends the court erred by allowing this expert to testify despite an allegedly insufficient expert designation.  Our resolution of the issues on appeal moots this question, as we conclude the expert's testimony does not support the $0 per share adjustment of the exercise price.

BlueFire is entitled to a new trial on the proper remedy afforded to plaintiffs for BlueFire's breach of contract. Assuming plaintiffs still seek specific performance of the warrants on retrial, it may be 15 cents per share (or less), based on the last recorded purchase of shares by Lincoln from BlueFire. Plaintiffs focused on $0 as the correct exercise price based on the issuance of the 600,000 commitment shares; they did not emphasize the subsequent issuances of securities, which had even lower prices than the $150,000 sale of the Initial Purchase Shares.

*The Court Appropriately Refused to Award Contract Damages*

"'Damages for breach of contract include general (or direct) damages, which compensate for the value of the promised performance, and consequential damages, which are indirect and compensate for additional losses incurred as a result of the breach' [citation]. Direct damages are typically expectation damages, measured by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract [citations]. Special, or consequential damages, on the other hand, are 'extraordinary in that they do not so directly flow from the breach [and] are recoverable only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made' [citation]." (*Latham Land I, LLC v. TGI Friday's, Inc.* (N.Y. 2012) 948 N.Y.S.2d 147, 151-152.)

The judgment awarding no damages to plaintiffs on their breach of contract claim was appropriate. Plaintiffs failed to come to grips with an election of remedies issue. (See *Rogers v. Davis* (1994) 28 Cal.App.4th 1215, 1220 ["plaintiffs cannot receive both specific performance and damages for breach of contract"].) Plaintiffs successfully asked the court to order specific performance of the warrants (though this relief was labeled as "declaratory" relief); the judgment declared an applicable exercise price of $0 per share and ordered BlueFire to allow plaintiffs to exercise *all of their warrants* at that

26

price.  At the same time, plaintiffs unsuccessfully requested damages (up to $1.8 million), claiming they would have sold shares of common stock had they been able to exercise the warrants in January 2011.  But if plaintiffs had exercised the warrants in January 2011 and sold the common stock between the exercise date and the trial date, they would not have possessed the shares of stock anymore, just the profits (if any) from the sale of the shares of stock.  Plaintiffs never elected to sue for damages only, based on BlueFire's breach of contract (which might have been wise in this case, given BlueFire's anemic stock price at the time of trial).  Neither did plaintiffs disclaim damages and choose specific performance of the warrants only (which might have been wise in a case in which the price of BlueFire stock had increased since January 2011).  One plausible interpretation of the judgment is the court made this decision for plaintiffs by authorizing the exercise of *all of the warrants* at a price of $0.  An award of damages in addition to this relief would have amounted to a double recovery.[14]

---

[14] Plaintiffs apparently convinced themselves that they were not seeking a duplicative recovery because they sought only the difference between the market value of BlueFire shares at the time of the Lincoln transaction (around 42 cents) and the market value at the time of trial (around 12 cents), rather than the difference between 42 cents and the posited exercise price (0).  But this approach essentially seeks recovery of "paper losses" of the stock (the 30 cent per share reduction in value between January 2011 and trial) while still retaining the potential upside of owning the stock.

Perhaps the court could have adopted a hybrid approach to the judgment, awarding some damages (based on a finding that plaintiffs likely would have sold some shares for a profit after exercising the warrants) and providing some specific performance (allowing plaintiffs to exercise the warrants for shares they would not have sold).  But the court could not give plaintiffs everything they requested (i.e., by allowing plaintiffs to obtain 5,740,741 shares of stock for $0, plus damages for the profit on shares that would have been sold had those same shares been obtained earlier), as this would put plaintiffs in a better position than if the warrants had never been breached.

27

The judgment also might be interpreted to indicate the court did not believe plaintiffs would have sold a significant number of shares of BlueFire stock had they been able to exercise the warrants in January 2011, or that plaintiffs could have profited by making substantial sales of stocks between January 2011 and the trial date. Defense expert testimony supports an inference that the issuance of more than five million common shares and the attempt to sell those shares would have wreaked havoc with the already low price of BlueFire stock. Plaintiffs admitted they had not sold any of the 1.6 million shares of common stock they owned from before the Lincoln transaction. These two facts support a conclusion that plaintiffs' damages case was speculative even assuming they were entitled to a reduction in the warrants' exercise price to $0 in January 2011. (See *Kenford Co., Inc. v. County of Erie* (N.Y. 1986) 67 N.Y.2d 257, 261 [damages cannot be recovered if they are "merely speculative, possible or imaginary, but must be reasonably certain"].)

In sum, the court's decision to award no damages was justified because the court ordered specific performance of the warrants. Substantial evidence also supported a finding that alleged contract damages were too speculative and uncertain to be awarded. It is unclear whether the court intended to rely on one or both of these reasons for awarding no damages to plaintiffs. Regardless, we now conclude that a new trial must be conducted to determine the proper remedy to be provided to plaintiffs for BlueFire's breach of contract.

DISPOSITION

The judgment is reversed and remanded for retrial, solely as to plaintiffs' remedy for BlueFire's breach of the warrants. Pursuant to Code of Civil Procedure section 908 and pending retrial, we refer to the trial court the task of returning the parties so far as possible to the positions they occupied before the enforcement of the judgment

28

(i.e., so long as it is possible, by ordering plaintiffs to return the stock they received as a result of the enforcement of the judgment to BlueFire). The parties' respective motions for the court to admit new documentary evidence on appeal for purposes of assessing mootness are granted. In the interests of justice, the parties shall pay their own costs incurred on appeal, as BlueFire was unsuccessful in its continued effort to claim its transaction with Lincoln was an excluded issuance.


IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


FYBEL, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES G. SPEIRS et al., | |
| Plaintiffs and Appellants, | G048698 |
| v. | (Super. Ct. No. 30-2011-00508691) |
| BLUEFIRE ETHANOL FUELS, INC., et al., | O R D E R |
| Defendants and Appellants. | |

On the court's own motion, the above-entitled unpublished opinion, filed December 15, 2015, is certified for publication in the Official Reports. The opinion meets the standards for publication set forth in California Rules of Court, rule 8.1105(c).

IKOLA, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

FYBEL, J.