Filed 4/27/23  PF1 v. Suba CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| PF1, INC.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ROLANDO M. SUBA et al.,<br><br>    Defendants and Respondents. | B322726<br><br>(Los Angeles County<br>Super. Ct. No. 18CV330021) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Peter H. Kirwan, Judge.  Affirmed.

Rossi, Hamerslough, Reischl & Chuck and Samuel A. Chuck for Plaintiff and Appellant.

Berliner Cohen, Dawn C. Sweatt, Thomas P. Murphy and Angela Shaw for Defendants and Respondents.

This is an appeal from a demurrer sustained without leave to amend as to three of five causes of action in appellant PF1's Second Amended Complaint (SAC), insofar as they were alleged against respondents Suba Technology Inc., Suba Energy, LLC, and Rolando M. "Rick" Suba (the Suba defendants).[1] The SAC arises out of two agreements: 1) a 2011 agreement (2011 APA) whereby PF1 sold all of its assets, consisting of a patent and related intellectual property, to defendant Alterlume in exchange for about 4 percent of Alterlume's stock and a deferred payment of $2 million dollars; and 2) a 2016 agreement (2016 ASA) which PF1 alleges transferred all of Alterlume's assets to respondents Suba Energy and Suba Tech and made respondent Rick Suba an officer and director and majority shareholder of Alterlume.[2] Fundamentally, PF1 alleges that the 2016 ASA triggered Alterlume's obligation to make the deferred payment of $2 million dollars required by the 2011 APA, but the 2016 ASA left Alterlume unable to make that payment.

The trial court sustained the Suba defendants' demurrer to PF1's causes of action for breach of contract, breach of fiduciary duty, and constructive fraud without leave to amend. The three causes of action all involve PF1's attempt to hold the Suba defendants liable for the actions and omissions of Alterlume. PF1 appeals from the judgment dismissing the Suba defendants, contending that all three causes of action state viable claims and

[1] Hereafter, we refer to these respondents individually as Suba Energy, Suba Tech and Rick Suba, and collectively the Suba defendants.

[2] Alterlume remains as a defendant in this action but is not a party to this appeal.

2

the trial court erred in granting the Suba defendants' demurrer to those three causes of action, and then doing so without leave to amend. We affirm the judgment.

## BACKGROUND

Two individual shareholders of PF1 began this action in 2018 as individuals, seeking to recover their share of the unpaid $2 million required by the 2011 APA, which money they had expected to be paid out in installments. They alleged they brought the action as individuals because PF1's corporate powers had been suspended. They also alleged that in or about September 2016, the Suba defendants and Alterlume entered into multiple business relationships, Rick Suba paid Alterlume $1.5 million, and an actual or de facto change of control of Alterlume occurred, triggering PF1's right to full and immediate payment under the 2011 APA. The individual PF1 shareholders further alleged they had been unable to obtain documentation of these events. The Alterlume and Suba defendants demurred to the entire complaint, and the trial court sustained the demurrer, primarily on two grounds: the individual shareholders were not signatories to the 2011 APA and they had failed to sufficiently allege a fiduciary duty owed to them or PF1 by the Alterlume or Suba defendants. The demurrer was largely sustained with leave to amend.

The individual PF1 shareholders were ultimately able to revive the suspended corporate powers of PF1, and in 2019 an amended complaint (FAC) was filed removing the individuals as plaintiffs and adding PF1. In February 2020, PF1 learned of the existence of the 2016 ASA, apparently receiving it through discovery in this case. PF1 then sought and obtained leave to file its second amended complaint (SAC). The 2016 ASA plays a

prominent role in PF1's theory of the case, but no copy of the agreement was attached to the SAC and judicial notice of the agreement was not requested by the Suba defendants.

The Suba defendants then brought the demurrer at issue in this appeal. The trial court sustained the demurrer to the first cause of action for breach of contract without leave to amend on the ground that the Suba defendants were not signatories to the 2011 APA, nor were they successors to or assignees of Alterlume's rights and obligations under that agreement.

The trial court sustained the demurrer to the third cause of action for breach of fiduciary duty without leave to amend on the ground that PF1 was seeking recovery of a contractual debt and a mere debt does not create a fiduciary duty.

The trial court sustained the demurrer to the fourth cause of action for constructive fraud without leave to amend on the ground that this cause of action requires a fiduciary relationship and there was none.

The trial court subsequently entered a judgment of dismissal as to the Suba defendants, and this appeal followed.

## DISCUSSION

A demurrer tests the legal sufficiency of the complaint. (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497.) On appeal from an order of dismissal after an order sustaining a demurrer, our standard of review is de novo; that is, we exercise our independent judgment about whether the complaint states a cause of action as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.)

" 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be

4

judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.)

A.      *First Cause of Action –Breach of Contract*

PF1's first cause of action alleges breach of the 2011 APA by the Suba defendants, who were not signatories to that agreement. It is well settled there must be a contractual relationship between a plaintiff and a defendant for a breach of contract cause of action to lie. (See, e.g., *Levy v. Only Cremations for Pets, Inc.* (2020) 57 Cal.App.5th 203, 208.) PF1 contends it adequately alleged an assignment of the 2011 APA to the Suba defendants occurred by operation of law when Alterlume and the Suba defendants agreed to the 2016 ASA, which PF1 alleges transferred all of Alterlume's assets, including those obtained through the 2011 APA, to the Suba defendants.

An assignment by operation of law occurs when a party accepts all the benefits of an executory contract; the law requires that party to accept the obligations of that contract as well. (*Recorded Picture Company* [*Productions*] *Ltd. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350, 361–362 (*Recorded Picture*).) The court in *Recorded Picture* explained the analytical framework used to determine whether an assignment by operation of law has occurred. First, the court looks at the

5

original contract and the benefits which were conveyed in that contract. (*Id.* at pp. 362–363.) Here, for purposes of this demurrer, the primary benefit conveyed by the 2011 APA was ownership of the patent and associated rights. The court then looks at the second contract and determines what benefits were conveyed in that contract. (*Ibid*.) Here, the 2016 ASA gave the Suba defendants the right to use the patent, but did not transfer title to the patent. For this reason alone, the Suba defendants did not receive all the benefits of the first contract.

PF1 contends it alleged Alterlume conveyed substantially all of its assets to the Suba defendants in the 2016 ASA and this allegation must be taken as true on demurrer.[3] "Substantially all" is not all. Further, this is a very general allegation, arguably a conclusion, and specific factual allegations control over such general factual allegations when there are inconsistencies. (See, e.g. *Perez v. Golden Empire Transit Dist*. (2012) 209 Cal.App.4th 1228, 1235–1236.) Here, the alleged specific terms of the 2016 ASA control over this general allegation. While those specific allegations are to a degree incomplete and unclear, they do show that Alterlume transferred less than all of the patent and associated rights it received under the 2011 APA to the Suba

---

[3]    While an agreement to convey all the assets of a corporation could be understood to include all of the benefits the corporation was receiving from a specific contract, the reference to conveying all corporate assets is more appropriate to a claim of successor liability, which the trial court, out of an abundance of caution, rejected on the ground that "[t]here is no allegation in the SAC that the Suba Defendants are the successors of Alterlume (which is still alleged to be a separate entity and named defendant in this case)."

defendants.[4]  Specifically, PF1 alleged that under the 2016 ASA, Alterlume gave Suba Tech manufacturing and production rights for five years, with a right of first refusal.

At oral argument, PF1 requested, for the first time, that we reverse the trial court's order sustaining the demurrer as to the first cause of action so that it could amend its complaint to allege that Alterlume was the alter ego of Rick Suba.  PF1 appears to

---

[4]     In what PF1 apparently intends to be a quote from the 2016 Agreement, PF1 alleges the agreement gave Suba Energy "(1) the '. . . License to manufacture [Alterlume]'s products in the Philippines' [and] (2) manufacturing rights exclusive rights to manufacture [that] will allow Suba to use Alterlume 's proprietary product design and manufacturing procedures in the direct manufacture or contracting of such services."  (Italics omitted.)  At the same time, PF1 alleges, the agreement gave Suba Tech "exclusive manufacturing and production rights for 5 years to SUBA TECH" and "granted SUBA TECH a 'Right of First Refusal.' "  (Italics omitted.)  PF1 contends that these allegations show that the Suba defendants were receiving all possible benefits of the patent which PIF conveyed to Alterlume under the 2011 APA.  We do not agree.  The allegations have clearly omitted important terms from the 2016 ASA, and do not show the geographic scope of the rights granted to Suba Tech or the length of the term for which rights were granted to Suba Energy.  But the allegations do show that Suba Tech received a temporally limited grant of rights.  Even if we were to assume that Suba Tech received manufacturing rights for everywhere but the Philippines, the five-year limited term granted to Suba Tech shows that those rights will revert to Alterlume, and the inclusion of a right of first refusal suggests that some rights of value will remain at that time.  Thus, as alleged, the 2016 ASA does not grant to the Suba defendants all of the rights under the patent remaining to Alterlume in 2016.

7

have raised this alter ego theory in response to the five-year term and right of first refusal in the 2016 ASA.  Those rights have apparently reverted to Alterlume, and PF1 appears to believe that if Alterlume had become an alter ego of Rick Suba before reversion, all rights would still belong to the Suba entities.[5]

We have discretion to consider an argument that leave to amend should have been granted, even when it is raised for the first time on appeal.  (*Tukes v. Richard* (2022) 81 Cal.App.5th 1, 19.)  More generally, however, when an appellant fails to raise an issue in the opening brief, raising it for the first time in a reply brief or at oral argument, we generally decline to address the issue or we address it in a summary manner.  (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11; *People v. Duff (*2014) 58 Cal.4th 527, 550, fn. 9; *Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1387–1388 [appellate court will not consider arguments raised for the first time in a reply brief because it deprives the respondent of the opportunity to respond to the argument].)  When we do consider such a claim, the appellant " 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' " (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.)  Appellant "must set forth factual allegations that sufficiently state all required elements of that cause of action.  [Citations.]  Allegations must be factual and specific, not vague or conclusionary." (*Id.* at pp. 43–44.)

---

5    To the extent that PF1 seeks to add these alter ego allegations to address the Suba defendants' claim that certain intellectual property was not covered by the 2016 ASA and remained with Alterlume, PF1 faces the same difficulties as in the reversion situation.

We do not believe PF1's theory that Alterlume is the alter ego of Rick Suba would save the first cause of action. "The essence of the alter ego doctrine is not that the individual shareholder becomes the corporation, but that the individual shareholder is liable for the actions of the corporation. (*Mesler v. Bragg Management Co.* [(1985)] 39 Cal.3d [290,] 300.) For all other purposes, the separate corporate existence remains." (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 415 (*Leek*).) Put differently, "[i]t is not that a corporation will be held liable for the acts of another corporation because there is really only one corporation. Rather, it is that under certain circumstances a hole will be drilled in the wall of limited liability erected by the corporate form; for all purposes other than that for which the hole was drilled, the wall still stands." (*Mesler,* at p. 301.) The corporation remains a separate entity. Thus, Alterlume would still be a separate entity from Rick Suba and as such would hold the reversionary rights under the 2016 ASA, demonstrating that not all benefits of the 2011 APA were transferred to the Suba entities by the 2016 ASA.

Further, when asked for facts which would support its alter ego claim, counsel for PF1 stated only that as a result of the 2016 ASA, Rick Suba became the predominant shareholder of Alterlume and the chairman of its board of directors, facts which had already been alleged in the complaint, and which are not sufficient to allege the alter ego doctrine, even for a closely held corporation. "To recover on an alter ego theory, a plaintiff need not use the words 'alter ego,' but must allege sufficient facts to show a unity of interest and ownership, and an unjust result if the corporation is treated as the sole actor." (*Leek, supra,* 194 Cal.App.4th at p. 415 [complaint alleging individual defendant

9

was owner of all stock of defendant corporation and personally made all its business decisions was not sufficient for alter ego liability].) PF1's alter ego allegations concerning Suba Tech and Suba Energy show it knows the proper way to plead an alter ego theory.

Thus, we decline PF1's request that we reverse the trial court's order and remand for leave to amend to add this alter ego claim. The request is untimely and both legally and factually deficient.

We also note that we need not rely on the specific details of the 2016 ASA, however, to uphold the demurrer. PF1 clearly alleged that it transferred the patent and associated rights to Alterlume in 2011. PF1 also clearly alleged that Alterlume granted rights under the patent to the Suba defendants in 2016. We take judicial notice that a patent is for a limited term. (35 U.S.C.A. § 154 (a)(2); Evid. Code, § 451, subd. (a).) While we do not consider the unbriefed intricacies of patent law, under the 2011 APA, Alterlume received a patent with a remaining term of x years, but by 2016 could only convey a patent with a remaining term of x – 5 years. Thus, even if Alterlume had transferred ownership of the patent in 2016, and not simply rights under that patent, it was simply not possible for Alterlume to convey all the benefit of the 2011 APA, that is, a patent for a term of x years.

PF1's claim that there is no requirement that all the benefits of the contract be transferred is incorrect. As the court in *Recorded Pictures* made clear, it is well established that when the assignee is not a party to the original contract, "[Civil Code] section 1589 'requires the *assignee* of an executory contract to accept the burdens when *all* the benefits of a full performance have inured to him.' " (*Recorded Pictures, supra*, 53 Cal.App.4th

10

at p. 362; see *Wilson v. Beazley* (1921) 186 Cal.437, 444 [rule applies only if "all the benefits of a full performance" have inured to the assignee; *Fruitvale Canning Co. v. Cotton* (1953) 115 Cal.App.2d 622, 626 [rule applies only if "the full benefit inured to the assignee"]; *Fanning v. Yoland Productions, Inc.* (1957) 150 Cal.App.2d 444, 448–451.) The court in *Recorded Pictures* rejected the plaintiff's claim that defendant Nelson was an assignee of the producer-Hemdale agreement because Nelson did not "accept or receive all of the benefits of that agreement." (*Recorded Pictures*, at p. 362.)[6]

The reason for this requirement is clear. The obligations set forth in the original contract are agreed to in exchange for the benefits of the original agreement. If the subsequent recipient does not receive the full benefits of the original agreement, he cannot be expected to satisfy the full obligations of that agreement.

At oral argument, PF1 contended that two cases found an assignment by operation of law occurred even though a party did not receive the full benefit of the original contract. PF1 cited

---

[6] As the court explained, the producers transferred to Hemdale "all domestic distribution rights in The Last Emperor—theatrical, television, and home video—in perpetuity. The producers also assigned the copyright in the picture to Hemdale. In contrast, the Hemdale-Nelson contract authorized Nelson to distribute the picture in the home video market only; Nelson did not receive the distribution rights for theatrical or television release. Further, Nelson's distribution rights terminated after seven years (and reverted to Hemdale), while Hemdale received the distribution rights in perpetuity. Moreover, Hemdale retained the copyright in the picture." (*Recorded Pictures, supra*, 53 Cal.App.4th at p. 363,)

11

these two cases in its opening appellate brief, but not for that proposition. We do not understand the cases as being inconsistent with the rule requiring the party to receive the full benefit of the contract for an assignment by operation of law to occur. In both cases, an agreement was assigned part way through the initial term of the agreement, but no assignment by operation of law was required. (*Brady v. Fowler* (1920) 45 Cal.App. 592, 593 (*Brady)*; *Bergin v. Van Der Steen* (1951) 107 Cal.App.2d 8, 10–11 (*Bergin*).) The agreement in *Brady* involved a lease and option agreement, and that original agreement expressly stated that its obligations were binding on successors and assignees. (*Brady,* at p. 595.) As discussed below, there are unique rules for assignments of leases and other real property interests. (See *Recorded Pictures, supra*, 53 Cal.App.4th at p. 367.) *Bergin* involved a concession agreement with an option for a contract for a second full term; the concession agreement was assigned pursuant to an express assignment agreement which contained terms requiring the assignees to make payments to the assignor. (*Bergin*, at pp. 10–11.) Thus, the assignment of the partial term was not an assignment by operation of law. The option provision was the subject of two written agreements in addition to the assignment agreement, and it was here that the court used Civil Code section 1589 to harmonize the agreements and determine the controlling terms of the option assignment. (*Bergin*, at pp. 11, 15–16.)

We note that PF1, in making its arguments concerning an assignment, sometimes uses language related to two other theories of assignment: the phrases "equitable assignment" and "constructive knowledge." PF1 does not develop arguments

12

showing how these theories would apply in this case, and, on the face of it, neither does apply.

The term "equitable assignment" does not simply mean any assignment that is imposed out of fairness to the parties. "The doctrine of equitable assignments is typically used to enforce an attempted assignment of rights that is technically defective or to create a right of subrogation." (*Recorded Pictures, supra,* 53 Cal.App.4th at p, 368.) For example, an equitable assignment has been held to apply to the attempted assignment of interest by the beneficiary of a spendthrift trust. (*Kelly v. Kelly* (1938) 11 Cal.2d 356, 365.) An equitable assignment to create a right of subrogation has been held to apply where one party involuntarily pays a debt for which another is primarily liable. (*Recorded Pictures,* at p. 368.) PF1 has made no attempt to explain how this doctrine would apply in this case and so has forfeited this claim.

PF1 has not cited any law holding that constructive knowledge of a contract creates an assignment outside the very narrow area of real property law. As the court in *Recorded Pictures* explained, the doctrine of constructive knowledge assignment is intended to "further[] the important common law principle favoring the free alienability of real property." (*Recorded Pictures, supra*, 53 Cal.App.4th at p. 367.) For example, a subtenant is charged with knowledge of the terms of the lease between the landlord and the tenant, and is bound by its terms and conditions, so that the landlord may evict the subtenant for violating the terms of the landlord-tenant lease. PF1 makes no argument for the applicability of this doctrine outside real property law and so has forfeited this claim. Further, even in real estate law, the doctrine is limited. The

13

subtenant is not liable for unpaid rent owed under the original lease. (*Ibid*.) Given that PF1 is not seeking the equivalent of unpaid rent under the 2011 APA, this doctrine, if applicable, would be of little use to PF1. The court in *Recorded Pictures* reached a similar conclusion. (*Ibid*.)

Finally, there is no reasonable probability that PF1 could amend to allege facts sufficient to state a claim. PF1 cannot allege facts which contradict the allegations of the SAC, specifically the allegations that the 2016 ASA contained a five-year term with a right of first refusal. (See, e.g., *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1034,) In addition, PF1 cannot allege facts overcoming the five years of elapsed time between Alterlume's acquisition of the patent in 2011 and the 2016 ASA which PF1 contends transferred all rights in that patent to the Suba defendants. Accordingly, the trial court did not abuse its discretion in denying leave to amend.

B.      *Third Cause of Action – Breach of Fiduciary Duty*

PF1's breach of fiduciary cause of action is premised on two sets of breaches: 1) Alterlume's decision to enter into the 2016 ASA; and 2) Alterlume's concealment of the existence of that agreement. PF1 seeks to hold Rick Suba liable under an aiding and abetting theory for the first breach and directly liable for the second breach, which occurred after he became an officer, director and controlling shareholder of Alterlume. A key element of breach of fiduciary duty is damages proximately caused by the breach, and it is this element which causes PF1's claim to fail.

PF1 has two relationships with Alterlume. One is as a minority shareholder of Alterlume; it is undisputed that Alterlume and its officers and directors at all times, and Rick Suba after 2016, owed a fiduciary duty to PF1 in PF1's capacity

14

as a minority shareholder. PF1 is also a creditor of Alterlume as a result of the 2011 APA. Generally, a corporation does not, as a matter of law, owe a fiduciary duty to its creditors; a contract or debt does not create a fiduciary relationship. (See, e.g., *Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 206 (*Ragland*).)

When a plaintiff has two different relationships with a defendant, the capacity in which the plaintiff suffered harm is generally dispositive of its cause of action seeking redress. (See *Speirs v. BlueFire Ethanol Fuels, Inc.* (2015) 243 Cal.App.4th 969 (*Speirs*).) In *Speirs*, plaintiffs were minority shareholders and also warrant holders. The warrants, which were contracts, gave the plaintiffs an option to purchase stock. (*Id.* at pp. 791, 780.) The plaintiffs alleged that the defendants, who were corporate officers and a majority shareholder, owed them a fiduciary duty based on the plaintiff's status as shareholders, and that defendants had breached that duty by refusing to apply anti-dilution protections in the warrants. (*Id.* at p. 780.) As the *Speirs* court explained, "plaintiffs' allegations of wrongdoing pertain to the abuse of their contract rights as warrant holders, not to alleged malfeasance against plaintiffs' interests as common stock shareholders. These distinct legal relationships—(1) the fiduciary relationship of corporate insiders to minority shareholders and (2) the contractual relationship of corporations and warrant holders—should not be conflated, even if the same individuals are both minority shareholders and warrant holders." (*Id.* at p. 983.)

15

The court added that the evidence and argument at trial was about the defendants' refusal to apply the anti-dilution clause but not about damages to the value of the stock. (*Speirs*, *supra*, 243 Cal.App.4th at p. 983.) The court affirmed the trial court's ruling in favor of the defendants "on the most straightforward ground: [defendants] did not owe a fiduciary duty to warrant holders, which is the role in which plaintiffs were allegedly harmed by defendants' actions. (See *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1599 [71 Cal.Rptr.3d 361] [existence of a fiduciary duty is a question of law].)" (*Speirs,* at p. 982.)

Like the plaintiffs in *Speirs*, PF1 has not alleged harm to the value of its shares. The harm alleged by PF1 was the non-payment of monies owed it under the 2011 APA, which is an abuse of its contractual rights as a creditor. PF1 more broadly and vaguely alleges it "is entitled to recover lost profits and other damages for out of pocket losses . . . and/or for the benefit of the bargain damages, as each may apply and be proven at trial." These are contract damages, not damages to the value of PF1's shares.

In its reply brief, PF1 contends it has alleged damage from the breach of fiduciary duty to it as a shareholder, specifically that the 2016 ASA left Alterlume "without any assets, without any technology and completely without any means to conduct business." This would be a very generous reading of the cited paragraphs. Even so, this would be an injury to Alterlume as a corporation. As such, it would have to be brought as a derivative action. (See *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106 ["A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders

16

when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act."].) We find a clearer statement of PF1's own damages in the next sentence, where PF1 contends that as a result of these actions, Alterlume has no "means of paying the $2M obligation" it owed to PF1 for the purchase of its patent.[7] This is an injury to PF1 as a creditor.

PF1 also contends that *Speirs* must be read narrowly, to apply only to situations where the shareholders are warrant-holders and not to situations where they are creditors. We do not agree. A creditor, like a warrant holder, has a contractual relationship with the corporation, and the reasoning of *Speirs* does apply. Further, although the issue was not before the *Speirs* court, the general rule in California is that a corporation does not owe a fiduciary duty to its creditors. (See, e.g., *Ragland, supra,* 209 Cal.App.4th at p. 206.) There are exceptions to this general rule, but PF1 has not identified such an exception or explained how it would apply to the facts of this case.

Finally, PF1 is simply incorrect that it "is permitted to plead to its liking, including that its claim for breach of fiduciary duty arises out of its status as a minority shareholder *and* a creditor." Whether a fiduciary duty exists is a question of law, and as a matter of law a corporation generally owes no fiduciary duty to a creditor. PF1 cannot plead this duty into existence. If PF1 had reason to believe that Alterlume's alleged breach of fiduciary duty resulted in damage to PF1's share value, then it should have alleged such damage. It has not.

---

[7] We note that under the 2016 ASA, all of Alterlume's other creditors were allegedly paid.

17

There is no reasonable probability that PF1 could amend its complaint to state a claim because the only additional damages PF1 has identified is damage to the corporation as a whole. That is not sufficient. Similarly, because Alterlume did not owe a fiduciary duty to PF1 in its capacity as a creditor, Rick Suba could not have aided and abetted any breach of a (non-existent) fiduciary duty, and there is no reasonable probability that PF1 could amend its complaint to allege aiding and abetting. The trial court did not abuse its discretion in denying PF1 leave to amend.

C.    *Fourth Cause of Action - Constructive Fraud*

"Constructive fraud ' " ' "is a unique species of fraud applicable only to a fiduciary or confidential relationship." ' " ' [Citation.] 'Constructive fraud "arises on a breach of duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by the latter to his prejudice." [Citation.] Actual reliance and causation of injury must be shown.' " (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1131.) Because there is no fiduciary relationship between a corporation and its creditors, and PF1 has not alleged harm to PF1 in its capacity as a minority shareholder, the constructive fraud claim fails. As was the case with the third cause of action, there is no reasonable probability that PF1 can amend its claim to state a claim for constructive fraud, and so the trial court did not abuse its discretion in denying leave to amend.

## DISPOSITION

The judgment of dismissal is affirmed.  Appellant to pay costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur:


GRIMES, J.


VIRAMONTES, J.

19